UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  4:19-CR-00832 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Houston, Texas |
| | ) | |
| GERALD M. GOINES, | ) | Friday, November 22, 2019 |
| | ) | |
| Defendant. | ) | (10:46 a.m. to 1:29 p.m.) |


ARRAIGNMENT / DETENTION HEARING

BEFORE THE HONORABLE DENA HANOVICE PALERMO,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

For Plaintiff:            ALAMDAR HAMDANI, ESQ.
                          SHARAD KHANDELWAL, ESQ.
                          U.S. Attorney's Office
                          1000 Louisiana, Suite 2300
                          Houston, TX 77002

For Defendant:           NICOLE DEBORDE, ESQ.
                          3515 Fannin St.
                          Houston, TX 77004

Clerk:                    Carol Felchak

Court Recorder [ECRO]:    Shoshana Arnow / Ruben Castro

Transcribed By:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, Texas  78468
                          361-949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

                            INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| O'NEIL BROWN | 5 | 42 | 82 | 85 |

| DEFENDANT'S WITNESSES | | | | |
|---|---|---|---|---|
| SHANNON BURNS-PENA | 86 | 89 | 91 | -- |
| ELYSE LANIER | 92 | 95 | -- | -- |
| KEVIN ROBINS | 100 | 103 | -- | -- |
| RICO GARCIA | 106 | 109 | -- | -- |
| CHRISTOPHER SAROFIM | 113 | 116 | -- | -- |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 1 | 14 |
| 2 | 14 |
| 3 | 28 |

1          **Houston, Texas; Friday, November 22, 2019; 10:46 a.m.**

2                         **(Call to order)**

3          **THE COURT:**  All right, I call *United States of*

4  *America versus Gerald Goines*, 4:19-832.

5          **MR. HAMDANI:**  Alamdar Hamdani on behalf of the United

6  States, your Honor.

7          **MS. DEBORDE:**  Nicole DeBorde on behalf of Mr. Goines,

8  your Honor.  Good morning.

9          **THE COURT:**  Good morning.  All right, so we're

10  scheduled for a detention hearing and arraignment.  Can we do

11  the arraignment first?

12          **MR. HAMDANI:**  Yes, your Honor.

13      **(Pause)**

14          **THE COURT:**  Ms. DeBorde, does your client waive

15  formal reading of the charges?

16          **MS. DEBORDE:**  He does, your Honor.

17          **THE COURT:**  All right.  Mr. Goines, you've had a

18  chance to discuss the charges against you with your attorney.

19          **THE DEFENDANT:**  Yes.

20          **THE COURT:**  And are you ready to enter a plea at this

21  time; yes or no?

22          **THE DEFENDANT:**  Yes.

23          **THE COURT:**  And how do you plead go the indictment,

24  guilty or not guilty?

25          **THE DEFENDANT:**  Not guilty.

1          **THE COURT:**  A not guilty plea has been entered on

2   your behalf.  Your case is set before Judge Hanks.  You are

3   scheduled for jury selection on January 13th at 9:00 a.m.  All

4   right, are we ready to proceed with the detention hearing?

5          **MR. HAMDANI:**  We are, your Honor.

6          **THE COURT:**  All right, you --

7          **MS. DEBORDE:**  We are as well.

8          **THE COURT:**  -- may be seated.

9          **MS. DEBORDE:**  Thank you.

10         **THE COURT:**  Okay.

11         **MS. SPEAKER:**  Nicole, here's a copy for you and your

12   client.

13         **MS. DEBORDE:**  Thanks.

14         **MS. SPEAKER:**  (Indisc.) about how long, three weeks,

15   two weeks?

16         **MR. SPEAKER:**  (indisc.)

17         **MS. SPEAKER:**  Two weeks.

18         **THE COURT:**  All right, you may call your first

19   witness.

20         **MR. HAMDANI:**  Yes, your Honor.  The United States

21   calls Special Agent O'Neil Brown.

22           **O'NEIL BROWN, GOVERNMENT'S WITNESS, SWORN**

23         **MR. HAMDANI:**  Your Honor, before I proceed, I've got

24   exhibits which I've already given to defense counsel.  Would

25   you like a copy?

1              **THE COURT:**  Please.

2         **(Pause)**

3                          **DIRECT EXAMINATION**

4    **BY MR. HAMDANI:**

5    Q    Please state your name for the record.

6              **MR. HAMDANI:**  Yes, your Honor?

7              **THE COURT:**  Can you make sure to speak into the

8    microphone.

9              **MR. HAMDANI:**  Oh, yeah, sure.

10             **THE COURT:**  And -- that's fine.

11   **BY MR. HAMDANI:**

12   Q    Please state your name for the record.

13   A    Special Agent O'Neil Brown.

14   Q    And how do you spell your name?

15   A    O-N-E-I-L B-R-O-W-N.

16   Q    And who do you work for, sir?

17   A    The FBI.

18   Q    Special Agent Brown, how long have you worked for the FBI?

19   A    Since 2010.

20   Q    And what kind of work do you do at the FBI?

21   A    I'm primarily assigned to investigate civil rights

22   matters.

23   Q    Are you aware of a man named Gerald Goines?

24   A    Yes.

25   Q    And do you see him here in the court today?

Brown - Direct / By Mr. Hamdani                6

1  A    Yes, sir.

2  Q    Is he --

3           **THE COURT:**  Mr. Hamdani, --

4  Q    -- can you point him out?

5           **THE COURT:**  -- can't hear you.

6           **MR. HAMDANI:**  Oh.

7           **THE COURT:**  You can move that whole thing, it's

8  movable.  Thank you.

9           **MR. HAMDANI:**  Is that better, your Honor?

10          **THE COURT:**  Yes, much.

11          **MR. HAMDANI:**  Perfect.  My kids say I'm loud so --

12  **BY MR. HAMDANI:**

13  Q    Special Agent Brown, can you point out Gerald Goines in

14  the courtroom here today?

15  A    Yes, sir.

16  Q    Could you point him out?  Right there in the green shirt?

17  A    Yes, sir, in the green jumpsuit.

18  Q    All right.  Let me ask you, Gerald Goines recently retired

19  from a job; what was that job?

20  A    He was a former officer with the Houston Police

21  Department.

22  Q    And when did he become an officer of the Houston Police

23  Department?

24  A    In 1984.

25  Q    And when did he retire?

Brown - Direct / By Mr. Hamdani                    7

1   A      In March of 2019.

2   Q      So about 34 years he was with the HPD.

3   A      Yes, sir.

4   Q      In those 34 years, what primarily -- what kind of work did

5   he primarily do?

6   A      The majority of his career was spent investigating

7   narcotics.

8   Q      And while investigating narcotics, where was his most

9   recent assignment?

10  A      The Narcotics Division.

11  Q      And what squad was he with?

12  A      Squad 15.

13  Q      All right, let me ask you a couple of questions about

14  confidential informants.  Based upon your investigation, first

15  of all, when a confidential informant buy is done for drugs,

16  how is that normally done; how many officers are involved, what

17  kind of procedures are in place?

18  A      Typically it involves at least two officers.

19  Q      And why are there two officers typically involved with a

20  confidential informant buy?

21  A      Obviously you have two officers to act as witnesses and

22  also for officer safety reasons.

23  Q      And do --

24          **THE COURT:**  I'm sorry, they act as witnesses and

25  what?

1          **THE WITNESS:**  And officer safety, ma'am.

2          **THE COURT:**  Okay.

3    **BY MR. HAMDANI:**

4    Q    And when a confidential informant does a narcotics buy, is

5    the officer supposed to watch that confidential informant?

6    A    Yes, sir.

7    Q    What about search them?

8    A    Yes.

9    Q    All right, before and after the buy?

10   A    Yes.

11   Q    All right.  Also, are you familiar with search warrants

12   and executing search warrants as it relates to your

13   investigation here?

14   A    Yes.

15   Q    And are you familiar with what is known as a no-knock

16   search warrant?

17   A    Yes.

18   Q    What is a no-knock search warrant?

19   A    A no-knock search warrant is essentially when an affiant

20   seeks authority from a judge to dispense with the normal

21   requirement of having to knock and announce their presence

22   prior to executing the search warrant.

23   Q    All right.  And based upon your investigation, was Gerald

24   Goines involved in several -- in the execution of several

25   search warrants over his career?

1   A    Yes.

2   Q    Relating to narcotics?

3   A    Yes, sir.

4   Q    Relating to confidential informant buys?

5   A    Yes, sir.

6   Q    And was he also involved in several no-knock search

7   warrants in his career?

8   A    Yes, sir.

9   Q    All right.  I now want to focus you to 7815 Harding

10  Street; are you familiar with that address?

11  A    Yes, sir.

12  Q    It's here in Houston, Texas.

13  A    Yes.

14  Q    Could you briefly explain how that address is relevant as

15  relates to January 28th, 2019, and Gerald Goines?

16  A    That is the address where Gerald Goines was the case

17  officer on the narcotics investigation and a warrant was

18  executed at that address on that day.

19  Q    Was it a no-knock --

20  A    Yes.

21  Q    -- search warrant?

22  A    Yes, sir.

23  Q    After the execution of the search warrant, what happened?

24  A    Ultimately as a result of the search warrant, two

25  homeowners were shot and killed and three HPD officers were

                    Brown - Direct / By Mr. Hamdani                    10

1   also shot, and two other HPD officers were injured.

2   Q    What were the name of the homeowners that were killed?

3   A    Dennis Tuttle and Rhogena Nicholas.

4   Q    All right.

5             **THE COURT:**  Say it again?

6             **THE WITNESS:**  Dennis Tuttle and Rhogena Nicholas.

7   They called her "Reggie."

8   **BY MR. HAMDANI:**

9   Q    And we'll get into that search warrant, the execution of

10  that, in more detail later on.  I kind of want to take you back

11  20 days to January 8th, 2019; could you explain to the Court

12  how that relates to Harding Street?

13  A    On that day, January 8th, 2019, several 911 calls were

14  placed to the Houston Police Department concerning that

15  address.

16  Q    Who placed those calls?

17  A    The call were placed by an anonymous caller at that time

18  who we've ultimately determined was Patricia Garcia.

19  Q    And what did Patricia Garcia say in her 911 calls as it

20  relates to 7815 Harding Street?

21  A    Essentially she said that her daughter was inside the

22  residence, she can see her daughter inside the residence, her

23  daughter was doing drugs inside the residence with the

24  occupants of the house.

25  Q    What else did she say?

1   A    She said her daughter was named Melissa and that she was

2   doing I think crack and heroin.

3   Q    Did she also talk about the owners of the house being

4   heroin dealers?

5   A    Yeah.  She talked about them being heroin drug dealers and

6   that they also had guns in the house.

7   Q    A machine gun.

8   A    Including machine guns.

9   Q    Did officers go out to the house that night?

10   A    Yes.

11   Q    And what did they see when they got there?

12   A    Two officers responded, and when they got there they

13   didn't see any activity at the house.  The house appeared to be

14   dark.

15   Q    So what did they do in response to that?

16   A    Because the house as they were observing it didn't appear

17   consistent with information they had received from the 911

18   call, they spent some time looking around and assessing the

19   situation.

20   Q    And then what happened after that?

21   A    Ultimately decided that the call did not appear to be

22   legitimate.  But as part of that process, one of the officers

23   actually called back the anonymous 911 caller.

24   Q    Who we now know is Patricia Garcia.

25   A    Yes, sir.

Brown - Direct / By Mr. Hamdani                                    12

1   Q    And could you explain to the Court what Patricia Garcia

2   wanted the officers to do?

3   A    She wanted the officers to go inside the house and get her

4   daughter and arrest her daughter, go inside the residence and

5   arrest her daughter.

6   Q    Did they want her to barge in?

7   A    Wanted her to go inside and barge in, yes.

8   Q    Since then, have you done investigation as to whether or

9   not the homeowners were actually drug dealers?

10  A    Yes.

11  Q    And what has that investigation revealed?

12  A    Part of the investigation included a canvas of the

13  neighborhood which was done, and also an interview with a

14  character witness of the homeowners.  And they were not drug

15  dealers.

16  Q    And anything indicate that the homeowners were heroin

17  users?

18  A    There was no heroin found in the house ultimately.

19  Q    Was there a machine gun found in the house?

20  A    No.

21  Q    Was the daughter in the house?

22  A    There was no daughter in the house that night.

23  Q    All right.  And so that 911 call or those 911 calls, were

24  those eventually passed on to Gerald Goines?

25  A    Essentially the information from that 911 call was passed

Brown - Direct / By Mr. Hamdani                    13

1   on to Gerald Goines several days later.

2   Q    What day was that?

3   A    January 11th.

4   Q    So on January 11, 2019, that looks like false information

5   from that 911 call was passed on to Gerald Goines; what did he

6   do with that information?

7   A    He received that investigation, was asked to look into it.

8   Q    And what did he do with it, what's the next step that he

9   took with it?

10  A    The next documented activity we have occurring was on

11  January 28th, 2019.

12  Q    So 17 days later, something happened on January 28th,

13  2019; what happened?

14  A    He sought a search warrant for the house.

15       **MR. HAMDANI:**  Your Honor, I'll draw your attention to

16  Exhibits 1 and 2.

17       **THE COURT:**  Special Agent, can I get you to pull that

18  closer to your mouth?

19       **THE WITNESS:**  Yes, ma'am.

20       **MR. HAMDANI:**  These have been marked as Government's

21  Exhibits 1 and 2, your Honor.  I've offered them to defense

22  counsel as well.  I offer them into evidence.

23       **MS. DEBORDE:**  I have no objection, your Honor, as it

24  relates to this hearing.

25       **THE COURT:**  Okay.  I'm just looking at -- this is

1   what you're talking about?

2            MR. HAMDANI:  Oh, no, those are defense exhibits.

3            THE COURT:  Oh, sorry, yeah, because I was going to

4   say, these say "Defendant's exhibit" on there.  All right,

5   Government's (indisc.)

6       **(Government's Exhibits Numbers 1 and 2 were received in**

7   **evidence)**

8            MR. HAMDANI:  Thank you, your Honor.

9            THE COURT:  Got it, thank you.

10  BY MR. HAMDANI:

11  Q    January 28th, 2019, you just testified that Gerald Goines

12  sought a search warrant; about what time did he seek this

13  search warrant?

14  A    The search warrant was ultimately signed at 1:37 p.m.

15  Q    And who did he go to to seek this search warrant?

16  A    Judge Marcum.

17  Q    Is that a municipal court judge?

18  A    Yes.

19  Q    And did Gerald Goines complete an affidavit as it relates

20  to that?

21  A    Yes.

22  Q    If you look at Exhibit 1, is that the affidavit that

23  Gerald Goines signed on January 28th, 2019?

24  A    Yes.

25  Q    Did Judge Marcum rely on the truthfulness of the facts in

1    the affidavit?

2    A    Yes.

3    Q    Did he believe that Gerald Goines had told him the truth

4    when he looked at that affidavit?

5    A    Yes.

6    Q    So let's look at the facts in that affidavit.  Could you

7    explain to the Court what specifically Gerald Goines was

8    alleging as it relates to 7815 Harding Street?

9    A    He was seeking a no-knock search warrant to execute on

10   that residence in regards to heroin.

11   Q    And what were the facts that were supporting that no-knock

12   search warrant as it relates to heroin?

13   A    The facts as described in paragraph five was a

14   confidential informant.  Paragraph five was a confidential

15   informant or CI buy that occurred the prior day allegedly.

16   Q    All right, so let's kind of back it up a little bit.  The

17   prior day is January 27th, 2019.

18   A    Yes, sir.

19   Q    And Gerald Goines is alleging that a confidential

20   informant made a purchase at the home.

21   A    Yes.

22   Q    Of drugs.

23   A    Yes.

24   Q    All right.  This confidential informant, what did Gerald

25   Goines say he saw and witnessed?

1  A    He essentially said that he met up with the CI, he

2  searched the CI, he gave the CI money, and he observed the CI

3  go directly into the residence.

4  Q    So he watched the CI go into the residence, according to

5  the allegations in that search warrant.

6  A    Yes.

7  Q    What else did he say about a CI that day?

8  A    After several minutes, the CI returned and returned

9  directly to Mr. Goines.

10 Q    And what, if anything, did the CI have in his or her hand

11 when they approached Gerald Goines?

12 A    A brown powdery substance.

13 Q    And what did the CI call that brown powdery substance,

14 according to Gerald Goines?

15 A    In the affidavit, it's referred to as "boy."

16 Q    And --

17 A    And "boy" is street slang according to the affidavit for

18 heroin.

19 Q    Did the affidavit talk about who the drugs were bought

20 from?

21 A    Yes, a male at the residence.

22 Q    Is there a particular color?

23 A    Yes.  The details on the male was a White male

24 approximately 55 years old, five-eleven, weighing 180 pounds.

25 Q    And what else did Gerald Goines claim the CI either saw or

1    did that day?

2    A    According to the affidavit, it alleged that the CI also

3    saw additional quantities of brown powder substance inside the

4    residence.

5    Q    And what about other baggies of heroin in the house?

6    A    Yes, large quantities of plastic baggies.

7    Q    What else did the CI claim -- or what else did Gerald

8    Goines claim the CI saw in the house that day?

9    A    A weapon.

10   Q    What kind of weapon?

11   A    A nine millimeter.

12   Q    So after the CI had returned, according to Gerald Goines,

13   back to him with that brown substance, what then happened as it

14   related to that brown substance?

15   A    According to the affidavit, Mr. Goines alleged that

16   himself and another officer, Officer S. Bryant, recognized the

17   brown powdery substance by sight and texture to be heroin.

18   Q    Is that "S. Bryant" supposed to be Steven Bryant?

19   A    Yes, sir.

20   Q    So with that information about there being heroin in the

21   house and the presence of a gun and the presence of drug

22   dealing of heroin at the house, what else did Gerald Goines do

23   as it related to that search warrant and the things he sought

24   from Judge Marcum that day?

25   A    Because of the gun and the presence of heroin, he sought a

Brown - Direct / By Mr. Hamdani                      18

1  no-knock search warrant.

2  Q    Now, with a no-knock search warrant, you had mentioned

3  earlier that it dispenses with the notion of knocking on the

4  door.  So how would, for example, police officers, based upon

5  your investigation, normally get into the house?

6  A    They would breach the door and simultaneously as they're

7  breaching the door, they'd announce their presence.

8  Q    What is a MOBI (phonetic)?

9  A    It's a breaching device.

10 Q    Is it like a device that you bang the door with?

11 A    It's a device to breach open the door, yes.

12 Q    All right.  Has the FBI had the opportunity to interview

13 Judge Marcum since January 28th, 2019?

14 A    Yes.

15 Q    What did Judge Marcum say as it relates to the facts in

16 the affidavit?  You already testified he relied upon the

17 truthfulness of those facts, correct?

18 A    He believed they were true.

19 Q    And what if when asked if there was no CI mentioned in the

20 affidavit, what would Judge Marcum have done?

21 A    Judge Marcum said he would not have signed off on this

22 search warrant because there would have been no probable cause.

23 Q    So for him, the probable cause was Gerald Goines watching

24 a CI go into the home, purchase heroin according to Gerald

25 Goines, come back out, and show that heroin to Gerald Goines.

EXCEPTIONAL REPORTING SERVICES, INC

1   A    The CI buy was why he signed and approved the search

2   warrant.

3   Q    Without that, Judge Marcum would not have found probable

4   cause.

5   A    Correct.

6   Q    You have since investigated the facts of that search

7   warrant; what is the conclusion about the veracity, the

8   truthfulness, of the statements made in that search warrant by

9   Gerald Goines?

10  A    That on January 27th, 2019, Defendant Goines was not in

11  the vicinity of Harding Street watching the CI conduct a drug

12  buy.

13  Q    So that was about 1:37 p.m.

14  A    Yes.

15  Q    Did Gerald Goines complete any other paperwork as it

16  related to the search or to the drug buy of Harding Street?

17  A    Yes.  The next documented activity is a tactical plan.

18  Q    What is a tactical plan?

19  A    A tactical plan just lists the officers that are planning

20  to execute the search warrant.

21  Q    And were the same or similar lies and misstatements that

22  were on the search warrant also prevalent in the tactical plan?

23  A    The tac plan or tactical plan also referenced the CI buy.

24  Q    And it also referenced, for example, Goines watching the

25  CI buy going -- CI go into the house and come back out.

1  A    Yes.  There's a checkbox and that checkbox was clicked

2  "yes."

3  Q    And did it also reference the fact that Goines claimed

4  that there was a weapon in the house, a nine millimeter weapon,

5  based upon the CI buy?

6  A    Yes.

7  Q    So there's been a tactical plan that was drafted by Gerald

8  Goines after the search warrant.  What, if anything, else was

9  drafted by Gerald Goines as it related to the search of Harding

10 Street?

11 A    The next thing was the offense report.

12 Q    All right, so at 1:37 p.m., you have the search warrant

13 being executed by Judge Marcum.  A little bit later you had the

14 tactical plan.  About what time was this offense report entered

15 into?

16 A    About an hour later.

17 Q    And did Gerald Goines again make misstatements about what

18 had occurred on Harding Street on January 27, 2019?

19 A    The offense report again referred to a CI buy allegedly

20 occurring on January 27th, 2019.

21 Q    And that is untrue.

22 A    That's not what the facts of the investigation has

23 revealed.

24 Q    All right, so based upon that search warrant, what then

25 did Gerald Goines do?

1  A    Later that day, the search warrant was executed.

2  Q    So let's talk about the execution of that search warrant.

3  How many officers were involved in the execution of the search

4  warrant?

5  A    From the squad, 11 officers, in addition to other officers

6  providing perimeter support.

7  Q    So there are 11 officers from Squad 15 involved, as well

8  as other officers for perimeter support.  Could you briefly

9  explain to the judge kind of how that would work, like you've

10  got some involved in perimeter support?

11  A    Okay, so the officers on his squad were assigned to

12  actually go to the house and make entry.  And officers on

13  perimeter were assigned to kind of just watch the perimeter of

14  the residence and kind of keep a safe perimeter around while

15  the search warrant was being executed.

16  Q    So there's about 20 officers at this point approaching

17  7815 Harding Street; is that right?

18  A    There's about 15 or so that are doing the search warrant.

19  In addition, there's other officers that are providing

20  perimeter support.

21  Q    There's lots of officers approaching 7815 Harding Street;

22  is that right?

23  A    Yes.

24  Q    And this is about what, 5:00 p.m. in the evening?

25  A    Yes, sir.

1   Q    And what are these officers wearing?

2   A    They're wearing police attire.

3   Q    Police attire.  And the officers that are going to be

4   going into the house, do they have guns?

5   A    Yes.

6   Q    All of them?

7   A    Yes.

8   Q    You had mentioned earlier a MOBI, a MOBI is used to breach

9   a door.  In this particular case, what was used to breach the

10  door?

11  A    A MOBI device.

12  Q    So a MOBI device was used to get into the house.

13  A    Yes, to breach the door.

14  Q    What happened right after the door was breached?

15  A    So the door was breached and officers began announcing

16  their presence.

17  Q    Did they shout their presence?

18  A    They were shouting "police," "search warrant," things to

19  that effect.

20  Q    And then what else happened right around that same time?

21  A    They made entry into the house and there was a large dog

22  that was in close vicinity.

23  Q    What happened to that dog?

24  A    That dog was shot by an officer.

25  Q    So that dog is being shot.  What about the homeowners,

 1  what about the female?

 2  A    There's a female homeowner in the house and she's

 3  screaming, including screaming obscenities.

 4  Q    So she's screaming, the dog is getting shot, then what

 5  happens?

 6  A    The next thing that happens -- you've got to remember,

 7  this is all happening at the same time.  There's a male --

 8  Q    Is it a matter of seconds?

 9  A    Yes.

10  Q    Okay, go ahead.

11  A    There's a male occupant from the rear of the residence

12  that begins shooting at police.

13  Q    So now there's a shootout between police and a resident of

14  the home.

15  A    And the male occupant, yes.

16  Q    Who was that male occupant?

17  A    He was identified as Dennis Tuttle.

18  Q    And who was the female?

19  A    Reggie, Rhogena Nicholas, or Reggie.

20  Q    After the shooting stopped, what was the end result?

21  A    Both home occupants, Reggie and Mr. Dennis Tuttle, were

22  shot and killed.  Three HPD officers were shot, including

23  Mr. Goines.  And also two other HPD officers were injured.

24  Q    Was there heroin found in the house?

25  A    Ultimately, no.

Brown - Direct / By Mr. Hamdani                    24

1   Q    Now, there were some drugs.

2   A    Yes.

3   Q    Small amount of pot, small amount of cocaine; is that

4   correct?

5   A    I believe pot, marijuana, and cocaine.

6   Q    Based upon your, again, investigation of the Tuttles,

7   anything indicate that these guys were drug dealers as Gerald

8   Goines swore to in his affidavit?

9   A    Again, the neighborhood canvas of the neighbors revealed

10  that they were not drug dealers.

11  Q    All right.  Okay, so now we've got two dead Houstonians.

12  As a result, what then next -- what then takes place?  Is there

13  an investigation into what happened?

14  A    Yes.

15  Q    And what does that investigation primarily involve?

16  A    That investigation is focused on just trying to identify

17  the confidential informants that made the alleged buy the day

18  before, on January 27th.

19  Q    So there is now a search for the confidential informant

20  that Gerald Goines swore to in his affidavit went to the house,

21  correct?

22  A    Yes.

23  Q    Did HPD approach Gerald Goines about the identity of the

24  confidential informant?

25  A    An officer with HPD did.

1   Q    And what did that officer discover?

2   A    He was eventually giving something that was able to

3   identify an individual who we can call CI Number One.

4   Q    And where was CI Number One identified by Gerald Goines

5   and given to the HPD officer?

6   A    January 30th.

7   Q    All right, so January 30 of 2019, two days after the

8   shooting, CI Number One is identified.  Was CI Number One

9   interviewed?

10  A    Yes, she was.

11  Q    What was the result of that interview?

12  A    She was interviewed that same day and she denied being the

13  confidential informant.

14  Q    And in fact subsequent to that, has the FBI interviewed CI

15  Number One?

16  A    Yes.

17  Q    And has CI Number One also denied being the informant?

18  A    Yes.  She said she never purchased drugs from that

19  residence.

20  Q    Has she even been to that residence, according to her?

21  A    She has not.

22  Q    So on January 30th, CI Number One told police officers

23  she's not the CI.  Did HPD then approach Gerald Goines again?

24  A    Yes, sir.

25  Q    And when did they approach Gerald Goines a second time?

1   A    The following day, on the 31st.

2   Q    The 31st.  Now, at this point, is Gerald Goines able to

3   talk?

4   A    No, sir.  So remember he'd been shot I think in the face

5   and neck area so he's still in the hospital, unable to talk.

6   Q    But he is able to write down.

7   A    Yes, sir.

8   Q    And does he write down a name for a second confidential

9   informant?

10  A    Yes, sir.

11  Q    And he passes that to Houston Police Department.

12  A    Yes, sir.

13  Q    And we'll call that person CI Number Two.

14  A    Yes, sir.

15  Q    Was HPD able to track down CI Number Two and interview

16  that CI?

17  A    Yes.

18  Q    And what did that CI say about making the purchase at 7815

19  Harding Street?

20  A    That CI stated she did not make a purchase from 7815

21  Harding Street.

22  Q    In fact, she had never been there.

23  A    Correct.

24  Q    And since then, the FBI has had the opportunity to

25  interview CI Number Two, correct?

1  A    Correct.

2  Q    And has she made the same statement?

3  A    She claims she never made a drug buy from 7815 Harding

4  Street.

5  Q    How many confidential informants did -- was Gerald Goines

6  responsible from?

7  A    He was assigned or listed as the primary handler of five

8  CI's.

9  Q    Briefly explain what is a handler?

10 A    Just he was the case agent for handling and dealing with

11 five CI's.  They kind of essentially worked for him.

12 Q    Okay.

13 A    He was the primary officer that they dealt with.

14 Q    And so there were five CI's in total.  Two of them have

15 already been interviewed, correct?

16 A    Yes.

17 Q    Were the other three also interviewed about whether or not

18 they had purchased drugs from 7815 Harding Street?

19 A    Yes.

20 Q    And what did they all say?

21 A    They all denied that they purchased drugs on January 27th,

22 2019, from 7815 Harding Street.

23 Q    In fact, none of them had been to Harding Street, correct?

24 A    They all denied it, yes.

25 Q    All right, so now the CI's, none of the CI's are -- none

1    of the Gerald Goines's CI's have been the ones that purchased

2    the drugs, according to the investigation.  What then happens?

3    Do they then go talk to Gerald Goines again?

4    A    Yes, about two weeks later.

5    Q    And what date was that?

6    A    February 13th, 2019.

7              **MR. HAMDANI:**  Your Honor, I would point the Court to

8    Exhibit Number 3, --

9              **MS. DEBORDE:**  For --

10             **MR. HAMDANI:**  -- Government's Exhibit Number 3.

11             **MS. DEBORDE:**  For purposes of this hearing, I do not

12   object to Exhibit Number 3 from the Government.

13             **THE COURT:**  Okay.

14        **(Government's Exhibit Number 3 was received in evidence)**

15   **BY MR. HAMDANI:**

16   Q    February 13th, 2019, HPD interviews Gerald Goines again.

17   A    Yes.

18   Q    This is after interviewing all of his CI's and realizing

19   none of those CI's are the ones that bought drugs from 7819 --

20   7815 Harding Street, correct?

21   A    Yes.

22   Q    All right.  If you look at Exhibit Number 3, this appears

23   to be a list of questions and statements made -- questions to

24   Gerald Goines and statements made by Gerald Goines, correct?

25   A    Yes.  And so this is questions and his handwritten answers

1  because we've got to remember, he's still in the hospital at

2  this point and he's still not able to communicate --

3  Q    And --

4  A    -- by speaking.

5  Q    And also who was present for this interview?  An HPD

6  officer was present, correct?

7  A    Yes.

8  Q    Who else was present for this interview?

9  A    I believe his counsel was.

10 Q    So his counsel's there as well.  All right, I want you to

11 look at the very first page of Exhibit Number 3.  The question

12 is:  "What is the name of your CI that you used for 7815

13 Harding?  What is Gerald Goines's response?

14 A    The response is:  "Gerald Goines, there was no

15 confidential informant."

16 Q    So to be clear, the response is:  "Gerald Goines, there

17 was no confidential informant."  Is he claiming he's the one

18 who bought the drugs?

19 A    He's -- the response of Gerald Goines, there was no

20 confidential informant.

21 Q    And when does he claim he bought those drugs from 7815

22 Harding Street?

23 A    On January 27th, 2019, the date on the affidavit, evening.

24 Q    And that's his writing, right, on the first page of

25 Exhibit Number 1.

1   A    Yes.

2   Q    Oh, and are you aware if the Defendant actually requested

3   this interview?

4   A    He did.

5   Q    All right.  The second question that is on the sheet is:

6   "What did you buy at 7815 Harding and where did you put it?"

7   A    Yes.  Response:  "Two baggies of heroin.  I believe I tag

8   it."

9   Q    Now what does that mean, I believe I tag it?

10  A    I believe I submitted it to evidence.

11  Q    That's what tag means, to tag it, put into evidence.

12  A    Yes.

13  Q    The third question on Exhibit Number 3 is:  "How was the

14  narcotics packaged?"  And what is Gerald Goines's response?

15  A    Handwritten response:  "Powdery substance, two small

16  baggies."

17  Q    The next question that is asked of Gerald Goines is:  "Do

18  you have a case file for 7815 Harding?"  What is his response?

19  A    "All notes on HPD computer system."

20  Q    Okay.  So he's asked a series of questions.  And then the

21  next thing is he's shown a photograph.

22  A    Yes.

23  Q    And how does he -- what does he -- how -- in that

24  photograph, could you describe what's in that photograph?

25  A    It appears to be primarily two baggies in Ziploc bags.

1   Q    And what does he claim those baggies are?

2   A    Essentially these are the drugs that he claimed he

3   purchased from 7815 Harding Street.

4   Q    So he identifies those as the drugs that he purchased from

5   7815 Harding Street, correct?

6   A    Yes.

7   Q    Had they actually been tagged into evidence?

8   A    No, they were not.

9   Q    In fact, what did HPD explain to Gerald Goines at that

10  time?

11  A    They explained that the drugs were actually found in his

12  vehicle, his city vehicle.

13  Q    Now, and again, you've had the chance to look at HPD

14  procedures and interview several HPD officers.  Is it

15  appropriate to take drugs that are purchased from a CI buy and

16  then just leave them in the car?

17  A    The officers we've spoken with said they usually send the

18  drugs the same day as the CI buy.

19  Q    Okay.  Could you read what Gerald Goines wrote on the next

20  page after the photograph?

21  A    Sure.  Question:  "Did I not tag the evidence?"

22  Q    And then what does he say?

23  A    Then:  "Yes, it would have been what I purchased from the

24  residence."

25  Q    So he's affirming this is what he purchased from the

Brown - Direct / By Mr. Hamdani                              32

1    residence, correct?

2    A    Yes.

3    Q    And then he made some statements after that.  Could you

4    read the first paragraph that he wrote?

5    A    It wrote, answer is:  "I screw up because I made a buy

6    without the correct manpower out there.  I knew when I bought

7    from him he would still be in possession.  I made the purchase

8    by myself."

9    Q    He also said some other things if you want to read that as

10   well.

11   A    Sure.  "I was looking to buy from a female.  I bought from

12   the male.  I had info regarding people at the residence.  I'm

13   not sure if the guy I bought from was male listed in info."

14   Q    Now, remember earlier and recall your testimony about a

15   statement he had made in the affidavit, the one he swore to,

16   where he mentioned Steven Bryant?

17   A    Yes.

18   Q    And could you again explain what did he say in the

19   affidavit about Steven Bryant?

20   A    The brown powdery substance was recognized by sight and

21   texture by Mr. Goines and Officer S. Bryant to be heroin.

22   Q    Did Gerald Goines on February 13th make a statement as it

23   relates to Steven Bryant?

24   A    Yes.

25   Q    And what did he say?

Brown - Direct / By Mr. Hamdani                    33

1    A    "Officer Bryant never observed the narcotic which was

2    purchased from the residence.  I placed that statement in the

3    affidavit."

4         **(Pause)**

5    Q    Special Agent Brown, the allegation by Gerald Goines on

6    February 13th, 2019, is that he's the one who bought the heroin

7    from 7815 Harding Street on January 27th, 2019, correct?

8    A    Yes.

9    Q    Has there been an investigation done as to determine the

10   truthfulness of that statement?

11   A    Yes.

12   Q    And what has that investigation shown?

13   A    By looking at a number of things, including cell-site call

14   detail records, cell-site location, witness interviews, photo

15   evidence, video evidence, that he did not make a purchase on

16   January 27th, 2019, according to the evidence we have.

17   Q    He was nowhere near Harding Street on January 27, 2019,

18   correct?

19   A    He was not in the vicinity.

20   Q    So I'm curious, Special Agent Brown, there was a picture

21   shown to Gerald Goines of two baggies of heroin; where did that

22   come from?

23   A    They actually were purchased by a CI at a different

24   location.

25   Q    And which part of town, which -- can you name the street

Brown - Direct / By Mr. Hamdani                          34

1    for that location?

2    A     On Napoleon Street.

3    Q     So those two baggies of heroin that were found in the car

4    of Gerald Goines after the Harding Street raid were actually

5    purchased from a location on Napoleon Street?

6    A     Yes, sir.

7    Q     So let's talk about that for a second.  You had mentioned

8    a CI; was it a CI buy?

9    A     Napoleon Street was purchase made with a CI buy and a

10   friend of the CI.

11   Q     And which CI is it; is it one of the ones we've talked

12   about?

13   A     Yes.

14   Q     Is it CI Number Two?

15   A     Yes, --

16   Q     All right.

17   A     -- so the same CI Number Two referred to earlier is now

18   who we're going to be talking about now.

19   Q     So those two baggies of heroin found in his car were

20   purchased you said by CI Number Two and a friend.  Could you

21   clarify for the Court what exactly happened on Napoleon Street?

22   And let's start off with a date.

23   A     So the date was January 21st, 2019.  CI Number Two and a

24   friend went to an address in Napoleon Street and a friend of CI

25   Number Two actually purchased the narcotics from a residence on

Brown - Direct / By Mr. Hamdani                    35

1    Napoleon Street.

2    Q    Have you had the opportunity to show those two baggies to

3    CI Number Two?

4    A    Yes.

5    Q    Has she identified those as the drugs that were bought

6    from Napoleon Street?

7    A    She identified them as the drugs her friend bought, yes.

8    Q    And did you talk to the friend?

9    A    Yes.

10   Q    And has the friend also identified those as the drugs that

11   were bought from Napoleon Street?

12   A    Yes.

13   Q    So after the friend on January 21st bought the drugs from

14   Napoleon Street, the two baggies of heroin, and gave it to the

15   CI Number Two, then what happened?

16   A    They were sent eventually handed up in the hands of

17   Mr. Goines.

18   Q    Now, according to CI Number Two, was Mr. Goines at

19   Napoleon Street when those drugs purchased?

20   A    No.

21   Q    Did he witness the buy?

22   A    He wasn't there.

23   Q    In fact, he didn't pick it up until when?

24   A    Two days later on January 23rd.

25   Q    So let's talk about that.  January 23rd, Gerald Goines

Brown - Direct / By Mr. Hamdani                          36

1   picks up the drugs that were part of a CI buy on January 21st;

2   is that right?

3   A    Yes.

4   Q    Now, you had testified earlier that it is part of Houston

5   Police Department procedure to have two officers involved and

6   for them to witness the buy, correct?

7   A    At a minimum two officers involved in a CI buy.

8   Q    And to witness the actual CI buy, correct?

9   A    Yes.

10  Q    That did not take place here.

11  A    When you say "here," which one are we talking about?

12  Q    I'm sorry, the January 21st buy on Napoleon Street.

13  A    No.

14  Q    Okay.  So where does he pick up the drugs from?

15  A    He picked them up from CI Number Two's residence.

16  Q    About what time?

17  A    It was after midnight.

18  Q    A little after midnight?

19  A    Yes.

20  Q    CI Number Two is a female, correct?

21  A    Yes.

22  Q    When he went to CI Number Two's residence after -- a

23  little after midnight, had he gone somewhere before as it

24  relates to Napoleon Street?

25  A    Yes.  He had went and saw a judge.

Brown - Direct / By Mr. Hamdani                          37

1  Q    He saw a judge.  Was that in the late night hours of

2  January 22nd?

3  A    Yes.

4  Q    So just a few minutes before, maybe an hour before he went

5  to visit CI Number Two.

6  A    Yes.

7  Q    And what did he get from that judge in the late night

8  hours of January 22nd, 2019?

9  A    He got a search warrant for the Napoleon Street address

10 and another associated address.

11 Q    In that search warrant, did he allege that he saw a CI go

12 into the house?

13 A    Yes.

14 Q    Did he allege he searched the CI before he went to the

15 house?

16 A    Yes.

17 Q    Did he allege that the CI came out with drugs?

18 A    Yes.

19 Q    In fact, what were the drugs Gerald Goines swore to in

20 this affidavit to a judge came out of that house?

21 A    Crack.

22 Q    Crack.  Did he also swear in the affidavit to saying that

23 he identified the drugs as crack?

24 A    Yes.

25 Q    Did he also swear in the affidavit that there was a weapon

1   in the house?

2   A    Yes.

3   Q    Did he also in that affidavit seek a no-knock search

4   warrant?

5   A    Yes.

6   Q    Based upon your investigation, are the allegations in the

7   affidavit true?

8   A    We've spoken with the CI who made the buy and her friend,

9   and they were not searched, those activities did not take

10  place.

11  Q    Okay, so on January 23rd, 2019, Gerald Goines picks up the

12  two baggies of heroin from CI Number Two, correct?

13  A    Yes.

14  Q    Does Squad 15 or Gerald Goines execute that search

15  warrant?

16  A    Two attempts were made to execute the search warrant.

17  Q    And why weren't they --

18          **THE COURT:**  Say it again.

19          **THE WITNESS:**  Two attempts were made, ma'am, to

20  execute the search warrant.

21  **BY MR. HAMDANI:**

22  Q    Could you give the dates of those attempts and why

23  eventually the search warrant was not executed?

24  A    The first one was on January 23rd.  And recall the search

25  warrant involved the use of SWAT operators, HP SWAT.  On

Brown - Direct / By Mr. Hamdani                    39

1    January 23rd, the HPD SWAT team was called away to an unrelated

2    event so that one was canceled.  And then that -- it was also

3    attempted to be executed the next day on January 24th.

4    Q    So we're now just four days prior to the Harding Street

5    raid, correct?

6    A    Yes.  And in this time on January 24th, it was canceled

7    because officers didn't observe any activity so it was

8    canceled.

9         **(Pause)**

10   Q    Okay, so January 24th they decide not to execute the

11   Napoleon Street search warrant.  I want to go back to CI Number

12   Two real quick.  You said he went to her house after midnight,

13   shortly after midnight on January 23rd, 2019.  Would that be

14   the last time he would see CI Number Two prior to the execution

15   of the Harding Street raid on January 28th?

16   A    No.

17   Q    When again would he see CI Number Two?

18   A    January 26, 2019.

19   Q    About what time?

20   A    Again shortly after midnight.

21   Q    In the early morning hours of January 26, 2019.  And where

22   does he see her?

23   A    At her residence.

24   Q    What takes place when Gerald Goines goes to visit his CI

25   on January 26, 2019?

Brown - Direct / By Mr. Hamdani                    40

1   A    CI Number Two claimed they engaged in sexual activity.

2   Q    According to CI Number Two, how long had she be -- how

3   long had she been in a sexual relationship with her handler?

4   A    She claimed for several years.

5   Q    You have had the chance of course to look at HPD policies

6   and talk to several officers.  Is it appropriate for a case

7   handler, for an agent, for an HPD officer, to have a

8   relationship with their CI?

9   A    You're not supposed to have sex with your CI's.

10  Q    Before I go on, and I want to make sure we cover this, the

11  Harding Street address, was a nine millimeter gun found at that

12  address?

13  A    No.

14  Q    No.  But there was a gun found in Gerald Goines's car.  So

15  we've talked about CI Number Two and him having sex.  After the

16  January 28th, 2019 raid, was there a search done of Gerald

17  Goines's car?

18  A    There were several, yes.

19  Q    And in fact that's where the two baggies of heroin were

20  found, right?

21  A    Yes.

22  Q    Besides heroin, what other drugs were found in the car?

23  A    There was a box inside his vehicle which had loose

24  narcotics and also some narcotics that were inside narcotics

25  submission envelopes.

Brown - Direct / By Mr. Hamdani                    41

1  Q    Could you describe to the Court some of those narcotics?

2  A    Crack, ecstasy, and marijuana.

3  Q    So Gerald Goines in his car has crack, ecstasy, and

4  marijuana, correct?

5  A    Yes.

6  Q    Is there anything else of interest that was found from the

7  search of his vehicle after the raid on Harding Street?

8  A    Yes.  There was also a weapon in the vehicle.

9  Q    Tell us about that weapon.

10  A    The weapon was ultimately ran and determined to be a

11  stolen weapon.

12  Q    So Gerald Goines had drugs and a stolen firearm in his

13  car.

14  A    Yes.

15  Q    What type of weapon was it; do you recall?

16  A    No.  I'd have to look at the report.

17  Q    Was it a handgun?

18  A    I'd have to look at the report.

19  Q    Sure.

20      **(Mr. Hamdani/Mr. Speaker confer)**

21  Q    Before I let you go, Special Agent Brown, we've talked

22  about several things that Gerald Goines did.  We've talked

23  about of course the items in his car that were found, his

24  relationship with his CI.  We also talked about search warrants

25  and we talked about the Harding Street search warrant.  But we

Brown - Cross / By Ms. DeBorde                                42

1   also talked about the Napoleon Street search warrant.  Do you

2   recall that testimony?

3   A    Yes.

4   Q    Are those the only search warrants right now that are

5   under investigation by the FBI?

6   A    There are a number of other locations and search warrants

7   that are still -- the investigation is ongoing.

8   Q    And in fact there are some search warrants where CI's have

9   claimed that they didn't do the purchases, correct?

10  A    Yes.

11  Q    And you mentioned -- finally, you said there were three

12  officers shot.  There was a fourth officer who received some

13  shrapnel, correct?

14  A    Yes.

15          **MR. HAMDANI:**  All right, with that, your Honor, I'll

16  pass the witness.

17          **MS. DEBORDE:**  May I proceed, your Honor?

18          **THE COURT:**  Please.

19                          **CROSS EXAMINATION**

20  BY MS. DEBORDE:

21  Q    Agent Brown, how long have you been with the FBI?

22  A    Since 2010.

23  Q    And before 2010, where did you work?

24  A    I was a lawyer.

25  Q    All right, and for how long were you a lawyer?

Brown - Cross / By Ms. DeBorde                    43

1   A    Practicing for two years.

2   Q    All right, and before that what did you do?

3   A    I was in law school.  And then before that, I was a

4   paralegal.  Before that, I was in the military.  Some work,

5   professional work was (indisc.) experience.  And then before

6   that, high school.

7   Q    Got it.  And during any of that time, any of that career

8   experience, did you ever work as a police officer on the

9   streets?

10  A    No, ma'am.

11  Q    And in your role as an FBI agent, have you worked in that

12  capacity as a patrol officer, for example?

13  A    No, ma'am.

14  Q    In fact that's -- describe your duties in general as an

15  FBI agent.

16  A    I investigate allegations of Federal criminal activity.  I

17  am not a patrol officer.

18  Q    All right, so you don't walk around and answer calls about

19  potential crimes or investigate street crimes, for example?

20  A    I don't answer calls, 911 calls, for service.

21  Q    And you've never been involved in any narcotics squad.

22  A    Correct.

23  Q    And you've not been employed by a police department at

24  all.

25  A    Correct.

Brown - Cross / By Ms. DeBorde                            44

1    Q    So what you know about say, for example, narcotics

2    investigation or police procedure, as you've described it in

3    this case, comes from where?

4    A    My experience as an FBI agent and this investigation and

5    other investigations.

6    Q    All right.  And in this circumstance, you've talked about

7    confidential informants.

8    A    Yes.

9    Q    Do you know how a person becomes a confidential informant?

10   A    Generally, yes.

11   Q    Tell us how they become a confidential informant.

12   A    Maybe you approach someone who you think might be of value

13   to your investigation and ask them if they want to be a CI.

14   Maybe you'd have someone who's facing criminal charges and they

15   want to work off those charges and they offer to be a CI.

16   Q    And often times would you agree that a confidential

17   informant is someone who is involved in the very criminal

18   activity you're trying to investigate?

19   A    They have to be in that world to know about it, yes.

20   Q    Okay.  And in fact the confidential informants that you've

21   described in this matter were just such confidential

22   informants, correct?

23   A    When you say "just such," what do you mean?

24   Q    Someone who was involved in the very types of crime that

25   were being investigated.

Brown - Cross / By Ms. DeBorde                    45

1    A    They bought drugs at CI's, yes.  And that they were

2    familiar with that world.

3    Q    Okay, and how were they familiar with that world?

4    A    From life experience.

5    Q    And when you say "that world," what world are you talking

6    about?

7    A    The world where they buy drugs.

8    Q    All right, so Confidential Informant Number Two who made

9    the allegations that you've just talked about with Mr. Hamdani

10   was potentially a drug user or dealer, correct?

11   A    Yes.

12   Q    And do you know whether or not that confidential informant

13   had a criminal history?

14   A    Yes.

15   Q    And did that confidential informant in fact have any

16   active, pending cases?

17   A    I don't know, but she did have cases -- I don't know how

18   active they were but she does have cases.

19   Q    Now, why would some individual who is out using drugs or

20   dealing drugs or has criminal activity in their lives want to

21   talk to the FBI?

22   A    Why would they want to provide us information?

23   Q    Right.

24   A    Because they're a witness in the case.

25   Q    And just out of the goodness of their heart, you think

Brown - Cross / By Ms. DeBorde                              46

1    that these confidential informants would want to talk to you.

2    A    I never asked them why they wanted to talk to me.  I just

3    asked them if they want to talk.

4    Q    What are some of the benefits that confidential informants

5    can potentially receive for cooperating with the Federal

6    government, for example?

7    A    That one honestly I don't know.

8    Q    Sometimes their cases are just not charged at all,

9    correct?

10   A    In theory, yes.

11   Q    All right.  And in practice, not just theory.

12   A    Correct, but that's not my decision.  But --

13   Q    And often times confidential informants who are living in

14   that world, as you've described it, are familiar with these

15   opportunities, correct?

16   A    They're familiar with the legal process.

17   Q    Yes.  And they can potentially also do things to reduce

18   their sentencing exposure in their own criminal cases, correct?

19   A    You mean by working off the charges, if you will?

20   Q    Yes.

21   A    Yes.

22   Q    Potentially avoid prison altogether, correct?

23   A    If that's what the outcome is, potentially.

24   Q    And in many circumstances, confidential informants give

25   information that is partially correct and maybe partially not

Brown - Cross / By Ms. DeBorde                    47

1   correct, isn't that also true?

2          **MR. HAMDANI:**  Objection, your Honor, we're getting

3   into speculation of what some CI's may do, what other CI's may

4   do (indisc.) specific questions about these particular CI's.

5          **THE COURT:**  Sustained.

6   **BY MS. DEBORDE:**

7   Q    Now, the confidential informant that you spoke with who

8   claimed that Mr. Goines was in a sexual relationship with her,

9   did you -- were you able to verify this through any other

10  source?

11  A    We were able to corroborate -- her allegations were

12  corroborated somewhat.

13  Q    And somewhat, how do you mean?  Tell us what you mean?

14  A    Well, I think there were photos of the CI on his phone.

15  And in she -- the confidential informant also had video

16  surveillance footage at her house which showed Defendant Goines

17  at her residence at the time in question.

18  Q    Okay, so in fact you know that -- first of all, do you

19  know how many confidential informants Goines had as a police

20  officer on his list?

21  A    He was the primary handler for five.

22  Q    And would you be surprised to learn that there were 22

23  confidential informants operating under a list that Officer

24  Goines was using?

25  A    I'd have to be familiar with that list.

Brown - Cross / By Ms. DeBorde                                48

1    Q    Okay.  And in fact you're not directly familiar with all

2    of the details of this case, are you?

3    A    I'm familiar with the details of the case, yes.

4    Q    All of it, because you're the lead case agent; is that

5    correct?

6    A    I'm one of the case agents, yes, ma'am.

7    Q    When did you first become involved in this particular

8    investigation?

9    A    In about February of 2019, late January or early February.

10   Q    All right, so what do -- can you tell us again what date

11   the Harding Street raid took place?

12   A    January 28th, 2019.

13   Q    So approximately two weeks after the incident in question

14   you first became involved.

15   A    I don't know the exact date but it was shortly thereafter

16   within days that the investigation was opened.

17   Q    Okay.  Now, you mentioned that you can corroborate that

18   then Officer Goines had actually gone to this confidential

19   informant's house, correct?

20   A    There was video surveillance, yes.

21   Q    And no one is questioning that he would in fact need to

22   meet with his own confidential informants, correct?

23   A    An officer meets with their CI.

24   Q    Yes.  And often times at odd hours of the day, night,

25   because it depends on when that confidential informant is

Brown - Cross / By Ms. DeBorde                    49

1   available.

2   A    Yes.  But there's also the fact that if you meet with the

3   CI, you typically have another officer with you so --

4   Q    And it's also not unusual for a police officer to have

5   photographs of their confidential informants for identification

6   purposes, correct?

7   A    I don't know the details of the photographs but I think

8   they might have been more on the steamier side.

9   Q    And do you know that personally, do you have that

10  information personally?

11  A    I believe it was in the reports.

12  Q    Okay, but you don't have that information personally,

13  you're relying on somebody else's description that there were

14  photographs in Mr. Goines's phone, correct?

15  A    Yes.

16  Q    You have not personally seen those photographs.

17  A    Correct.

18  Q    Now I want to talk a little bit about the notes that

19  Mr. Hamdani discussed with you in earlier testimony that are

20  before the Court as Exhibit Number 3; do you have those in

21  front of you?

22  A    Yes, ma'am.

23  Q    Can you tell us the date on which this particular meeting

24  took place?

25  A    February 13th, 2019.

Brown - Cross / By Ms. DeBorde                                50

1   Q    All right, and were you involved in that meeting?

2   A    No.

3   Q    Tell us what the circumstances were; how did this meeting

4   come to be?

5   A    Mr. Goines reached out to a lieutenant at HPD and asked

6   how do I give a statement.  That lieutenant forwarded his

7   request to HPD SIU investigators.

8   Q    Okay, and so from your understanding, Officer Goines, who

9   is currently in the hospital at the time of this request,

10  reached out to one of his supervisors and asked to have a

11  meeting with police.

12  A    I don't believe the lieutenant was one of the supervisors

13  but she was a lieutenant in the Narcotics Division.

14  Q    Okay, and what was Mr. Goines's rank at the time?

15  A    I think he was an officer.

16  Q    All right, and so did that individual outrank Officer

17  Goines?

18  A    Yes.

19  Q    So he spoke to this person, a lieutenant, and said, get me

20  in touch with people I can make a statement for.

21  A    I think it was a text and said how do I give my statement.

22  Q    Okay.  And in fact the police then answered his request

23  and went to the hospital.

24  A    Yes, ma'am.

25  Q    Can you describe Mr. Goines's medical condition at the

Brown - Cross / By Ms. DeBorde                                        51

1    time that this particular meeting took place?

2    A    So he is still in the hospital, he was in the hospital

3    bed, and he's still unable to communicate verbally.

4    Q    And did he appear to be in any pain?

5    A    He appeared to be in discomfort.

6    Q    Okay.  And in fact there were times during that meeting

7    during which Mr. Goines had to take a break to adjust, to begin

8    to focus; is that right?

9    A    There were breaks, yes.

10   Q    And at the time of the meeting that Mr. Goines requested

11   at the hospital, he was undergoing a series of surgeries for

12   being shot in the face and neck, correct?

13   A    I know he was still in the hospital.  I'm assuming he was

14   getting treatment.

15   Q    All right, and what was he getting treatment for?

16   A    His gunshot wounds.

17   Q    And where were those gunshot wounds?

18   A    In the face and neck area.

19   Q    All right.  And do you know how many surgeries Mr. Goines

20   had to go through while he was in the hospital?

21   A    No, ma'am.

22   Q    And do you know whether or not Mr. Goines was on

23   medication as part of his recovery from being shot in the face?

24   A    No, ma'am.

25   Q    You don't know.

Brown - Cross / By Ms. DeBorde                          52

1   A    No, I don't know for a fact but I would assume he would

2   be.

3   Q    Okay.  Now, you have participated I'm sure as a Federal

4   agent in many interviews with witnesses and potential suspects

5   over your years in your career, correct?

6   A    Yes, ma'am.

7   Q    What is your role in determining their level of alertness

8   or health; what do you do to make sure that the witness you're

9   getting information from is healthy?

10  A    You interview the witness.

11  Q    And what do you say?

12  A    You ask them questions.

13  Q    Like?

14  A    What did you see, what did you hear, what happened.

15  Q    Does it concern you at all if a witness that you're

16  interviewing is high on drugs?

17  A    That would be of interest.

18  Q    Okay, why would that be of interest?

19  A    Because it may affect their state.

20  Q    What state?

21  A    Their mental state.

22  Q    And how would that affect the statement?

23  A    Because they're high --

24           MR. HAMDANI:  Objection, your Honor, again calls for

25  speculation.  What kind of drugs somebody is on could affect

Brown - Cross / By Ms. DeBorde                               53

1    some (indisc.)

2             **THE COURT:**  Make it more specific.

3             **MS. DEBORDE:**  All right.

4    **BY MS. DEBORDE:**

5    Q    When a witness is high on drugs, can you depend on the

6    reliability of their statement?

7    A    Again, depends what drugs, depends how high.

8    Q    You would want to know that information, correct?

9    A    It would be relevant.

10   Q    And one of the documents -- in fact, if you flip to the

11   third page of the exhibit which is marked Number 3 for the

12   Government, Mr. Hamdani asked you to read a response to the

13   question, how is the narcotics packaged.  But you only read

14   part of that exhibit; is that accurate?

15   A    Correct.

16   Q    All right, could you read us the rest?

17   A    "Powdery substance, two small baggies."  And then slash

18   (indisc.) then don't recall.

19   Q    Okay, don't recall.

20   A    Correct.

21   Q    Why did you fail to read us that portion of the exhibit a

22   moment ago?

23   A    Don't recall.

24           **(Pause)**

25   Q    Later, at least it appears later based on the order of the

Brown - Cross / By Ms. DeBorde                             54

1   pages presented to you and now in evidence as Government's

2   Exhibit Number 3, there's a question from then-officer Goines;

3   is there not?

4   A    What page, ma'am?

5   Q    I believe it's going to be right after the photograph

6   which is going to be page five of this exhibit.

7   A    A-0005?

8   Q    It's marked as page eight and 0007.

9   A    Yes, ma'am.

10  Q    All right, what is that question?

11  A    "Did I not tag the evidence?"

12  Q    When you have the subject of an interview asking your

13  question, what is your training about how you're supposed to

14  respond to a witness who is asking questions about the very

15  information they're giving?

16        MR. HAMDANI:  Objection, your Honor.  He wasn't there

17  for the interview.  He's not the one who took that question.

18        MS. DEBORDE:  Your Honor, I believe it's relevant as

19  to the value of this particular exhibit which the Government

20  has offered into evidence as proof that somehow their case is

21  more makeable.

22        THE COURT:  I'll allow it.

23  BY MS. DEBORDE:

24  Q    When you're talking to a witness who seems confused or

25  asks questions during your interview, what are you trained to

1  do?

2  A    You continue to interview and ask clarifying questions to

3  try to figure out what's going on.

4  Q    Okay, and in reviewing the video of this particular

5  interview and the notes from it, did you see whether or not

6  this particular officer asked any clarifying questions?

7  A    I don't recall.  But the interview appeared like it was

8  conducted appropriately.  And luckily it's also video recorded,

9  too, ma'am.

10  Q    Okay, you say "likely."  Do you not know whether it's

11  video recorded?

12  A    I said luckily.

13  Q    Okay, I'm sorry, I did not understand that clearly.

14          **THE COURT:**  So then this interview with these notes

15  the day that they were taken on February 13th was video

16  recorded?

17          **THE WITNESS:**  Yes, ma'am.

18          **THE COURT:**  Okay.

19  **BY MS. DEBORDE:**

20  Q    Do you have that video recording for the judge here with

21  you today?

22  A    No.

23  Q    How did you decide what to bring with you to this hearing?

24          **MR. HAMDANI:**  Objection, your Honor, it goes into our

25  discussions which are attorney-client privileged.

1          **THE COURT:**  Okay, I'm not going to let him answer

2    attorney-privileged information.

3          **MS. DEBORDE:**  Thank you, Judge.

4    **BY MS. DEBORDE:**

5    Q    Now, at the beginning of your testimony, Mr. Hamdani was

6    asking you about HPD police procedure; do you recall that part

7    of your testimony?

8    A    Yes.

9    Q    And in his questioning to you about police procedure,

10   there were questions about how many narcotics officers you're

11   supposed to have.

12   A    Correct.

13   Q    Where did you learn what that supposed HPD procedure was?

14   A    I learned the SOP from the officers we interviewed who are

15   on the narcotics squad, several of them.

16   Q    Okay, so you interviewed several narcotics officers.

17   A    Yes.

18   Q    Did you ever have a chance to review the Houston Police

19   Department's General Orders?

20   A    No, I have not.

21   Q    And do you know what is the policy manual for the Houston

22   Police Department?

23   A    No, ma'am.  All I know is through what the officers told

24   me and what the SOP was and what they typically did, which was

25   to have two officers at a minimum.

Brown - Cross / By Ms. DeBorde                                57

1    Q    Okay, and so when you say "SOP," tell us what you mean.

2    A    Standard operating procedures.

3    Q    All right, and one of the reasons that you surmised that a

4    police officer might need more than one police officer in order

5    to make a drug buy was what?

6    A    Based on what the officers told me during interviews.

7    Q    Okay, well why do you think that they need more than one

8    officer?

9    A    They said for officer safety.

10   Q    Okay, for officer safety.  Did they give any other reasons

11   that they needed --

12           **THE COURT:**  (Indisc.)

13   Q    -- more than one officer?

14           **THE COURT:**  For what point, when -- what -- I'm kind

15   of lost as to at what point they need more than one officer.

16   To do what?

17           **MS. DEBORDE:**  I'll clarify.  Thank you, Judge.

18   **BY MS. DEBORDE:**

19   Q    In your testimony earlier before this Court, you mentioned

20   that you learned that Houston Police Department officers

21   require more than one police officer to be present during a

22   controlled buy.

23   A    The officers were interviewed said their typical practice

24   was to have two -- at least two officers present when dealing

25   with a CI.

Brown - Cross / By Ms. DeBorde                          58

1   Q    Okay, and do you know whether or not that is a typical

2   practice or a required practice?

3   A    That was their typical practice.  I do not know if it was

4   a required practice.

5   Q    And you don't know whether or not that's in fact

6   department policy.

7   A    It's just what the officers said they routinely did.

8   Q    And you offered up during your testimony about whether or

9   not two or more officers were required during a controlled buy

10  earlier, that there were reasons that the officers gave you for

11  this; what were those reasons?

12  A    Primarily for officer safety.

13  Q    And secondarily for what?

14  A    I guess to have another witness as well --

15  Q    And --

16  A    -- to kind of watch what's going on on the scene.

17  Q    And why would you need another witness if in fact there is

18  a confidential informant there present with that one officer?

19  A    To testify as to what happened.

20  Q    All right, why couldn't the confidential informant testify

21  as to what happened?

22  A    They could, too.

23  Q    Now, you also testified during this testimony about police

24  use of confidential informants that a police officer, according

25  to what I understood you to be saying was HPD policy, should

Brown - Cross / By Ms. DeBorde                                    59

1    watch everything that a confidential informant does.

2    A    You mean in the terms of when they're making a drug buy?

3    Q    Yes.

4    A    Yes, so the officers we spoke to said their typical

5    practice was they would watch the CI leave their presence, go

6    directly to where the drugs were being purchased, and watch

7    them come directly out of the place where drugs were purchased,

8    and come directly back to the officer.

9    Q    Okay.  And is it possible, if you know, under those

10   scenarios for a police officer to keep eyes on that

11   confidential informant at all times?

12   A    Going by the affidavits I'm reading, it says, for

13   instance, some of the affidavits he wrote, that they returned

14   directly to him.

15   Q    Okay, returned from where?

16   A    Wherever they bought the drugs.

17   Q    And while they were buying the drugs in those affidavits,

18   is it the case that the police officer can actually still see

19   the informant?

20   A    It says:  "I observed the CI return directly to me."  So

21   if someone is saying they observed the CI return directly to

22   them, then that's what they swear to in the affidavit.

23   Q    Do drug buys often happen in open, out in the middle of a

24   park or in the sidewalk?

25   A    They happen at all locations, so parks, sidewalks,

Brown - Cross / By Ms. DeBorde                          60

1    residence.

2    Q    And if they're at a residence, where -- would they occur

3    outside or inside?

4    A    Could be both.

5    Q    And if it is in fact inside a residence, would the police

6    officer march up with the confidential informant and go inside

7    the house?

8    A    No.

9    Q    Why not?

10   A    That would be unwise.

11   Q    Why would that be unwise?

12   A    For a police officer to march up with his CI to a drug

13   location to make a buy?  Because that puts the life of the CI

14   in danger.

15   Q    Okay, why would it put the life of the CI in danger?

16   A    Because they're walking up to make a drug buy with a

17   police officer next to them.

18   Q    Okay, and how is this dangerous?

19   A    They make any drug buy.

20   Q    What could happen?

21   A    Bad things.

22   Q    Now, you also talked about searching the informant before

23   they make this buy and after they make this buy; why is that a

24   part of police procedure?

25   A    You search them before to make sure that you know they

 1    don't -- not taking any drugs into the location.  And then you

 2    search them afterwards, after they give you the drug, to make

 3    sure they're not keeping any drugs on them.

 4    Q    Why don't you just ask the confidential informant, do you

 5    have any drugs on you?

 6    A    Why don't you just ask them?

 7    Q    Why don't you just ask them?

 8    A    Because they want to pat them down because that's what

 9    you're supposed to do.

10    Q    Why are you supposed to do that?

11    A    So you know they've either don't have any drugs they're

12    taking into the location, or when they come back out, they're

13    not keeping any drugs on their possession.

14    Q    I understand.  Why don't you just ask them instead of

15    patting them down whether they have any drugs on them?

16    A    You can ask them but it would be more appropriate to also

17    pat them down.

18    Q    And why is that more appropriate?

19    A    To make sure they don't have any drugs on them that

20    they've either taken into the residence or retaining on their

21    persons after the buy.

22    Q    To make sure they're telling you the truth?

23    A    Probably, yes.

24    Q    Now, you also mentioned that there was testimony -- let me

25    back up.

Brown - Cross / By Ms. DeBorde                    62

1       There was testimony about the difference between a search

2  warrant that is executed by, you know, knocking on the door, I

3  guess, and announcing yourselves, and what we've heard here,

4  called a, "no-knock warrant"?

5  A    Yes, ma'am.

6  Q    And in you testimony earlier, you mentioned that a no-

7  knock warrant circumvents the, quote, unquote, normal

8  requirement that officers knock and announce, correct?

9  A    If that's what you have.

10  Q    Okay, now, why -- well, do you know, statistically

11  speaking, at least for HPD, what percentage of all narcotics

12  warrants are conducted without knocking?

13  A    Do I know that number definitely?  No.

14       And at what time period are we talking about?  There's a

15  lot of unknowns.

16  Q    And in memorable history, are you aware that the Houston

17  Police Department conducted no-knock warrants in almost every

18  single drug warrant case?

19       **MR. HAMDANI:**  Your Honor, he already testified that

20  he doesn't know all the facts or the statistics of no-knock

21  search warrants.

22       **THE COURT:**  I really don't see the relevance of it,

23  Ms. DeBorde.

24            //

25            //

Brown - Cross / By Ms. DeBorde                              63

1   **BY MS. DEBORDE:**

2   Q    Is there anything sinister about a no-knock warrant?

3   A    It wasn't on uncommon.

4   Q    Do you know why narcotics warrants are conducted without

5   a -- without knocking first?

6   A    Yes.

7   Q    Why?

8   A    According to the affidavit -- and so, for example, on the

9   front of the Government Exhibit 1 -- so Government Exhibit 1,

10  page 6:

11       "Affiant requests authorization to enter the suspected

12  place and premises without first knocking, announcing the

13  presence and purpose of officers executing the warrant sought

14  herein.

15       "As probable cause to believe that such knocking and

16  announcing would be dangerous, futile, or would inhibit the

17  effective investigation of the offense described in this

18  Affidavit..."

19  Q    Much like walking up to the house with a confidential

20  informant, in uniform, to buy drugs, correct?

21  A    Can you rephrase?

22  Q    Now, in this particular case, there were actually 911

23  calls that came in reporting that there was drug dealing going

24  on at the Harding Street residence, correct?

25  A    Yes, ma'am.

Brown - Cross / By Ms. DeBorde                                    64

1   Q     Do you know, approximately, how many 911 calls were made?

2   A     Three.

3   Q     And in these calls, the caller complained that her

4   daughter was in the residence, using drugs, correct?

5   A     Yes.

6   Q     That her daughter was using heroin inside the residence?

7   A     Yes.

8   Q     That there were machine guns or at least one machine gun

9   inside the residence?

10  A     Yes.

11  Q     That -- what other things did this caller say was

12  happening in the house?

13  A     Drug dealers with those inside the house doing drugs.

14  Q     And would you agree with me that this is the kind of

15  things -- kind of thing that police should investigate when

16  someone in the community calls?

17  A     Yes; keyword being, "investigate."

18  Q     Now, do you remember the date that the first 911 call came

19  into police?

20  A     January 8th.

21  Q     When did the next 911 call come in to police?

22  A     They were all that day.

23  Q     All on that day?

24  A     Yes.

25  Q     And have you listened to the 911 calls?

Brown - Cross / By Ms. DeBorde                    65

1   A     It's been a while, but, yes.

2   Q     And what was the state of the caller?

3   A     Excited.

4   Q     All right.  Are you familiar with investigations into

5   heroin dealers or heroin dealing?

6   A     Can you be more specific?

7   Q     Sure.  Do you know what kinds of things narcotics officers

8   look for in terms of identifying a heroin dealer?

9   A     A heroin dealer specifically --

10  Q     Yes.

11  A     -- or narcotics investigations in general?

12  Q     Heroin dealers specifically.

13  A     I'm assuming it would be what they would do in any other

14  norm -- normal narcotics investigation.

15  Q     Are you assuming because you don't know?

16  A     We fall to officers and things you would do is, you would

17  actually have a C.I. make a drug buy; maybe you would conduct

18  surveillance; maybe do some research on a residence, find out

19  who they are, their criminal history.

20  Q     And do you know whether or not there's a difference

21  between a heroin dealer and someone dealing, say, marijuana?

22  A     They both deal in drugs.  But those, obviously, are two

23  different type of drugs.

24  Q     Do you know if the methodology, for example, for someone

25  dealing heroin, is different from someone dealing any other

1  kind of drug?

2  A    I do not know the methodology of marijuana versus heroin.

3  Q    Okay, because you've not had any experience in the

4  narcotics task force, correct?

5  A    I've never been to -- assigned the narcotics task force.

6  Q    Now, in this particular case, you've said that you -- did

7  you personally canvas the neighborhood to determine that the

8  residents at that home were not heroin dealers?

9  A    That was done by HPD to canvas the neighborhood.

10  Q    Okay, and when did HPD do this?

11  A    I believe it was either February or March of 2019.

12  Q    When the FBI was already involved in the case?

13  A    Yes.

14  Q    And why is it that the FBI did not do this?

15  A    Because it was already --

16        **MR. HAMDANI:**  Objection, your Honor.  What's the

17  relevance of that?

18        **MS. DEBORDE:**  It goes to show the state of mind

19  there -- of Mr. Goines at the time of this investigation.

20        And it also goes to show whether or not this case is

21  something that the Government can ultimately prove, as they

22  have described.

23        The testimony from this agent, on direct testimony,

24  about this warrant, is that these people in this residence were

25  absolutely not drug dealers.

Brown - Cross / By Ms. DeBorde                    67

1          And we believe that we have information that shows

2   otherwise.  We would like to talk to this agent about that

3   information.

4          **MR. HAMDANI:**  Your Honor, first of all, we've got

5   probable cause here.  We've got the indictment had already been

6   returned by the Grand Jury.  So when it comes to the actual

7   proving case or when it comes to detention hearings, that

8   part's done.

9          What we're going to be talking about at the end of

10  the day, when it comes to detention, is just strictly the

11  evidence; strictly the case.

12         This is not go to (indisc.).

13         **THE COURT:**  Do you think it goes to the strength of

14  the case?

15         Because on a detention hearing, what I'm going to

16  have to decide is whether he is a danger to the community or a

17  flight risk, such that I can't safely release him on bond.

18         And the factors that I consider, as you know, are the

19  strength of the case that the Government has shown.

20         **MS. DEBORDE:**  I believe that its relevance is two-

21  fold, your Honor.

22         The strength of the case, obviously, is paramount.

23         But on -- for -- to the prong of the question that

24  you have to answer as a Judge, about whether or not this

25  individual is dangerous to the community, haphazardly running a

Brown - Cross / By Ms. DeBorde                    68

1    search warrant on a house with no true reason to believe that

2    the individuals in it are actually, in fact, heroin dealers is

3    potentially more dangerous than running a search warrant, which

4    potentially complies with the norms in the narcotics

5    investigation world.

6          The motivation behind doing something with absolutely

7    no just cause is completely a different thing from an officer

8    executing a search warrant based on information he believes to

9    be valid.

10         **MR. HAMDANI:**  Your Honor, I think what Counsel is

11   trying to insinuate is that there was -- she's trying to say

12   there's probable cause to get into the house.

13         If she wants to ask the agent what Judge Marcum

14   thought about probable cause -- the person who signed the

15   warrant and what he relied upon when he signed that warrant --

16   I think that would be appropriate and that might get to kind of

17   the question she wants answered.

18         **MS. DEBORDE:**  And if I might respond Judge.

19         If Mister -- Mr. Hamdani obviously thought it was

20   relevant for this Court to hear, on direct examination; spent a

21   great deal of time making sure that this agent testified about

22   his own views as to whether or not the individuals in that

23   residence were, in fact, heroin dealers.

24         He testified that, based on his understanding of the

25   investigation, they were not.

Brown - Cross / By Ms. DeBorde                    69

1              Mr. Hamdani felt that that was relevant.  We believe

2     that countering that evidence with information in cross-

3     examination is also relevant.

4              THE COURT:  I'll give you some leeway.

5              MS. DEBORDE:  Thank you, your Honor.

6              THE COURT:  But we are going to take a five-minute

7     break.

8              MS. DEBORDE:  Thank you, Judge.

9              THE MARSHAL:  All rise.

10        (Court is in Recess)

11             THE MARSHAL:  All rise.

12             THE COURT:  Be seated.

13             All right, Ms. DeBorde, you may continue.

14             MS. DEBORDE:  Thank you, your Honor.

15    BY MS. DEBORDE:

16    Q    Now, in the warrant that we've been talking about, which

17    is marked Government's Exhibit Number 1 -- I say warrant and I

18    mean affidavit supporting the warrant -- there is a description

19    of what officers should expect to find in the home, correct?

20             THE COURT:  Are you looking at a particular

21    paragraph?

22             MS. DEBORDE:  In general, Judge.

23             And it's really a more general question.  And I can

24    make the question more specific.

25             //

Brown - Cross / By Ms. DeBorde                              70

1    **BY MS. DEBORDE:**

2    Q    Is there a person in that home that's described in this

3    affidavit?

4    A    Yes.  Paragraph 2.

5    Q    All right, and what is that person described as?

6    A    Fifty-five years of age, a white male, 5'11" in height,

7    180 pounds in weight.

8    Q    Okay.

9    A    And (indisc.) question you asked earlier says, "to wit,

10   heroin."

11   Q    Okay, and there are also other descriptors.  In fact,

12   there's a belief that you know that Officer Goines has their

13   guns in the house, correct?

14   A    There's a what?

15   Q    Belief.  He has a belief that there are guns in the house.

16   A    According to this affidavit, yes.

17   Q    Okay, and there were, in fact, guns in the house?

18   A    Yes, ma'am.

19   Q    And there was, in fact, a 55-year-old male in the house?

20   A    I believe he might have been a little bit older than 55.

21   Q    All right, meeting the description given in the affidavit?

22   A    He was white.  I think the weight was significantly

23   different.

24   Q    Okay.

25            THE COURT:  I'm sorry.  I couldn't understand you.

Brown - Cross / By Ms. DeBorde                              71

1        **THE WITNESS:**  So he was white, but the weight was

2   significantly different.

3   **BY MS. DEBORDE:**

4   Q    Now, Officer Goines also gave a tactical briefing, as

5   you're aware, correct?

6   A    Yes.

7   Q    What's a tactical briefing?

8   A    It's just a briefing where you inform the officers who may

9   be taking part in the search warrant; kind of their stack or

10  their order of lineup and activities each one of them is going

11  to be expected to perform.

12  Q    Okay, and during that debriefing, you're aware that then

13  Officer Goines mentioned that there was a pit bull or a

14  specific type of dog at the home, correct?

15  A    That came up -- and I think it initially came up from a

16  patrol officer who at that briefing; not Mr. Goines.

17  Q    Okay, so they had facts about what to expect, correct?

18  A    From the patrol officer about the dog, yes.

19  Q    And many of those facts turned out to be exactly correct?

20  A    Can we go fact by fact or --

21  Q    Many of those facts turned out to be exactly correct.

22  A    Some of them were correct.

23       **MR. HAMDANI:**  Objection, your Honor.  He's already

24  asked the question; fact by fact.  If there's a specific fact

25  she wants to ask.

Brown - Cross / By Ms. DeBorde                              72

1          **THE COURT:**  Let's just move along.

2     **BY MS. DEBORDE:**

3     Q    Now, let's move directly to the day that the warrant was

4     executed.

5          You mentioned on direct testimony that there were

6     approximately 15 HPD officers, in clearly marked attire, who

7     approached the home, correct?

8     A    About, yes.

9     Q    About?  Give or take what?

10    A    Four.

11    Q    So somewhere between 11 and 20 police officers?

12    A    About 11 approaching the house and in other marked units

13    that were providing assistance away from the house on the

14    perimeter.

15    Q    And when you say, "marked unit," just for clarification in

16    the record, what's that?

17    A    A police car that's marked with -- clearly marked, "HPD,"

18    a marked unit.

19    Q    And even when you do a, quote, unquote, no-knock warrant,

20    police officers immediately announce themselves, correct, when

21    they go in?

22    A    So they breach and they announce simultaneously.

23    Q    Okay, and why do they -- if they have the ability to do a

24    no-knock warrant -- announce themselves at all?

25    A    So I guess the occupants know who is coming in.

Brown - Cross / By Ms. DeBorde                          73

1   Q    All right.  And these occupants have that same experience.

2        You had between 11 and 20 officers in clearly marked

3   uniforms with their clearly marked police cars outside the

4   house, coming into the home, yelling, "Police," correct?

5   A    As the door was breached, yes.

6   Q    And you mentioned that one of the decedents inside was

7   yelling back at these police officers, correct?

8   A    One of the -- the female was yelling obscenities.

9   Q    All right.  At the police officers?

10  A    I remember who actually was yelling obscenities.

11  Q    And the person in the back, who was a male --

12  A    Yes.

13  Q    -- actually also communicated with police officers,

14  correct?

15  A    Yes.

16  Q    In fact, what did he say?

17  A    Something about, I think, "What the fuck," something of

18  that, and, "I told you, there are no drugs here."

19  Q    Okay, "I told you there are no drugs here."

20  A    That was a statement from a few of the officers that he

21  made.

22  Q    All right.  Do you know any other statements that these

23  individuals inside this residence made?

24  A    Those were generally the statements that were made.

25  Q    Were there others that you recall?

Brown - Cross / By Ms. DeBorde                              74

1   A    Not that I recall at this time.

2   Q    I want to talk with you for a moment about the items you

3   describe as having been found in then Officer Goines vehicle.

4   A    Yes.

5   Q    Now, this was a city-issued vehicle, correct?

6   A    Yes.

7   Q    He was not at this residence, in his own personal car?

8   A    Which day are we talking about?

9   Q    On the day of the execution of this warrant.

10  A    I believe they got there in a raid van.

11  Q    Okay, and do you know, where did you find -- or where did

12  officers who did this investigation find Officer Goines car?

13  A    It was parked at the police station.

14  Q    All right.  And so it was right where it was supposed to

15  be, correct?

16  A    It was parked at the police station.

17  Q    Is that where it was supposed to be?

18  A    I guess.

19  Q    All right.  And where inside the vehicle were the drugs,

20  that you've described for this Court, found?

21  A    So this was about several weeks later, during a search --

22  one of the searches of the vehicle.  And I believe they were

23  inside a box.

24  Q    And how many boxes were in the car, if you know?

25  A    I don't know.  I just know that the drugs that were found

Brown - Cross / By Ms. DeBorde                    75

1    were inside a box.

2         And they were described as loose narcotics, some of which

3    were inside narcotics submission envelopes.

4    Q    And what's a narcotics submission envelope?

5    A    It's an envelope where you put narcotics inside for

6    tagging it.

7    Q    What kinds of quantities are we talking about?

8    A    I don't know.  There was over 20 different pieces of

9    drugs.  I don't recall each quantity.

10   Q    Okay.  Well, are we talking kilos?

11   A    I don't believe it was kilos.

12   Q    All right, are we talking small amounts?

13   A    It wasn't kilos.

14   Q    Okay, nowhere close, was it?

15   A    And, again, you know, I'm not -- it's been a while since

16   eighth grade, but it wasn't kilos.

17   Q    Okay, can you describe the size of the box where these

18   remnants were found?

19   A    I don't know the size of the box.  But it was loose

20   narcotics about 20 or so pieces.

21   Q    All right, inside a box, in the back of a narcotics

22   officer's vehicle?

23   A    Inside the box, inside a narcotics officer's car, yes.

24   Q    And when I say, "narcotics officer's car," the car

25   assigned to him by the department?

1  A    Yes, ma'am.

2         **THE COURT:**  I have a question.

3         Is it a police -- is it a marked police car or did he

4  have an undercover car?

5         **THE WITNESS:**  His car was unmarked.

6         **THE COURT:**  Unmarked, but was a city-owned car?

7         **THE WITNESS:**  It was a city-leased vehicle.  Yes,

8  ma'am.

9         **THE COURT:**  Okay.

10  **BY MS. DEBORDE:**

11  Q    And if you know, this vehicle -- do you know what kind of

12  vehicle it was?

13  A    I do, but I'd be guessing.

14       It's like a -- I don't know.  I think it was brown or tan

15  in color.  I don't remember the exact make.

16  Q    Okay, and it was whatever they assigned to him to do his

17  job as a narcotics officer?

18  A    Yes, ma'am.

19  Q    You also discussed, on direct testimony, your converse --

20  or someone's conversations with this confidential informant who

21  claims to have made the buy of the drugs, pictured in

22  Government's Exhibit 3, as having been purchased on Napoleon?

23  A    Yes.

24       So the buy was actually made by C.I. Number Two's friend.

25  Q    Okay, so C.I. Number Two's friend.

1        Is that person also functioning as a confidential

2   informant for narcotics?

3   A    They were not one -- they were not on the books as a C.I.

4   Q    Okay, what about C.I. Number Two?

5   A    Yes.  Gerald Goines was C.I. Number Two's case handler.

6   Q    And how did you come to the conclusion that, in fact, C.I.

7   Number Two's friend made the purchase?

8   A    C.I. Number Two said so, and it was also corroborated by

9   C.I. Number Two's friend.

10  Q    Okay, so you talked to these people?

11  A    Yes.

12  Q    So that's what you mean by corroboration?

13  A    And there also, I believe, cell site data, which put them

14  in the location at that time -- both of their phones.

15  Q    And did you fingerprint the particular baggies?

16  A    I don't know about that, ma'am.

17  Q    And do you know whether or not law enforcement ever

18  bothered to do anything like fingerprinting or DNA testing to

19  determine who had had contact with the baggies in question?

20  A    I know they showed the photo to the C.I. Number Two's

21  friend.

22       She said, "Yes, that's the drugs."  She was very familiar

23  with the location.

24       They also showed the photo to C.I. Number Two, and she

25  also identified the drugs.

Brown - Cross / By Ms. DeBorde                        78

1    Q    And what about these particular drugs, pictured in

2    Government's Exhibit Number 3, identify them as, "unique among

3    all other drugs"?

4    A    According to C.I. Number Two's friend, they were packaged

5    very distinctly.

6    Q    Okay, and this packaging, which we can see by looking at

7    the photograph, appears to be two small narcotics baggies?

8    A    Yes.

9    Q    And have you seen narcotics baggies before?

10   A    As part of this investigation, yes.

11   Q    And it looks like every other narcotics baggy, correct?

12   A    C.I. Number Two's friend was pretty adamant that she

13   recognized these to be the baggies that she purchased, which is

14   corroborated by C.I. Number Two herself.

15   Q    And I appreciate that.

16        But I'm asking you whether or not the baggies pictured in

17   Government's Exhibit Number 3 have any particularly unique

18   identifying factor?

19   A    They were unique to C.I. Number Two's friend because she

20   recognize them.

21   Q    And I'm asking if they were unique to you.

22   A    To me, no.  Because I didn't purchase them.

23        **THE COURT:**  Can I ask a question?  Tell me what I'm

24   looking at here.  This is the picture we're talking about,

25   right?

1          THE WITNESS:  Yes, ma'am.  So up top, there are two

2  Ziploc bags.  And within them are the baggies of heroin.

3          THE COURT:  So this little brown darker spot here is

4  a bag of heroin?

5          THE WITNESS:  Yes.

6          THE COURT:  And that's a bag of heroin?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  And what the person purchased was that

9  little thing, as opposed to this baggy within the baggy?

10          I'm just trying to clarify.

11          THE WITNESS:  I believe it was the smaller baggies,

12  because it had the -- it was a distinctive color that C.I.

13  Number Two's friend remembered.

14          THE COURT:  Okay.

15  BY MS. DEBORDE:

16  Q    And you say it was a distinctive color.  It was the color

17  of heroin?

18  A    I think the -- something I found, (indisc.) was

19  distinctive about the baggy, the packaging, not just what was

20  packaged inside of it.

21  Q    Okay, can you look at Government's Exhibit Number 3, the

22  photograph, with us?

23          MR. HAMDANI:  Your Honor, I'm just going to ask

24  what's the relevance.  We've gone down this road quite a bit.

25  We've established that, you know, C.I.s bought these particular

Brown - Cross / By Ms. DeBorde                    80

1    baggies.

2              I'm just kind of -- I just -- as to (indisc.)

3    detention hearing.

4              **MS. DEBORDE:**  I'll move on, Judge.

5              **THE COURT:**  Okay, thank you.

6    **BY MS. DEBORDE:**

7    Q    Do you know how long after the notes were taken -- that

8    are in Government's Exhibit Number 3 -- Mr. Goines was in the

9    hospital?

10   A    I don't know when he was released.

11   Q    And do you know how many more surgeries he went through in

12   the hospital after the information that you see here, in

13   Government's Exhibit Number 3?

14   A    No, ma'am.

15   Q    And do you know what his mental health or drug use --

16   legal drug use in the hospital -- status was at the time of

17   these comments?

18   A    No, ma'am.

19        All I can tell was from watching the video and as

20   questions were being asked by the investigator, it was being

21   video recorded.

22        And I believe you were also there as well.  So everything

23   seemed in order.

24   Q    Mr. Goines never discharged a weapon at Harding Street,

25   correct?

Brown - Cross / By Ms. DeBorde                                    81

1   A    I'd have to go back and refresh my memory of that one.

2   Q    You think he might have discharged a weapon?

3   A    I don't recall specifically.

4        I know that the male occupant shot at police officers and

5   several other police officers shot back at the male occupant.

6   Q    Okay, do you know where Mr. Goines was in the stack of

7   people that went into the house?

8   A    I'd have to look at the attack plan to figure out his

9   exact count number.

10  Q    But you do know, based on the statements of the officers

11  that you talked to, that Mr. Goines -- then Officer Goines --

12  raced into that house after gunshots were heard, to drag his

13  men out, don't you?

14  A    I don't know about placing.  But I know shots were fired

15  and officers were shot.

16       Thereafter, as officers were injured, a subsequent officer

17  would go to rescue the officer who was shot.

18       That cop would be -- that cop was shot.  And someone else

19  would go to rescue him, and that officer was shot as well.

20  Q    And that officer was shot in the face and neck?

21  A    He was -- Mr. Goines was shot in the face and neck, yes,

22  ma'am.

23           **MS. DEBORDE:**  Pass the witness.

24           **THE COURT:**  Okay.

25           **MR. HAMDANI:**  Your Honor, brief redirect?

**EXCEPTIONAL REPORTING SERVICES, INC**

Brown - Redirect / By Mr. Hamdani                    82

1          THE COURT:  Are you ready to redirect?

2          MR. HAMDANI:  I am.  Thank you.

3          THE COURT:  Briefly?  It's 12:30 here.

4          MR. HAMDANI:  I'll just -- would you like to take a

5    break, your Honor?

6          THE COURT:  No, no.  I'm just trying to move the

7    hearing along.

8          MR. HAMDANI:  Absolutely.  I hear you loud and clear.

9                    REDIRECT EXAMINATION

10   BY MR. HAMDANI:

11   Q    Special Agent Brown, on January 28, 2019, you heard -- you

12   understand that Gerald Goines was shot, correct?

13   A    Yes.

14   Q    Who led the officers to that location in the very first

15   place?

16         MS. DEBORDE:  Objection, your Honor.  Asked and

17   answered.  Cumulative.  This has been covered.

18         MR. HAMDANI:  Your Honor, she asked, and I just want

19   to make sure that it was Gerald Goines who got them there.

20         THE COURT:  I think that that's --

21         MR. HAMDANI:  Okay.

22         THE COURT:  -- pretty clear.

23         MR. HAMDANI:  Thank you, your Honor.

24         //

25         //

Brown - Redirect / By Mr. Hamdani                     83

1   **BY MR. HAMDANI:**

2   Q    I want to go back to the February 13, 2019 statement by

3   Gerald Goines; the ones that relate to Exhibit Number 3.

4   Correct?

5   A    Yes.

6   Q    Do you remember that?

7        That was videotaped?

8   A    Yes.

9   Q    His attorney Nicole DeBorde was there?

10  A    Yes.

11  Q    There were no objections made at that time to the

12  interview going forward?

13  A    The interview proceeded and ended accordingly.

14  Q    In fact, she said she was prepared to sit and make a

15  statement on that video, correct?

16  A    I don't know what she said.  But she was present.

17  Q    There were no objections made as to the drugs being taken;

18  there were no objections made as to the ability to answer

19  questions, correct?

20  A    The questions were asked.  She was present, and Mr. Goines

21  answered them by writing them down.

22  Q    You had also talked about -- a couple of things I just

23  want to look at here.

24       You were asked about not being a narcotics officer.

25  I want to ask you a couple of questions.

Brown - Redirect / By Mr. Hamdani                    84

1          Whether you're a narcotic officer or not, is it okay

2    to lie on a search warrant?

3    A     No.

4    Q     The Magistrate Judge depends upon the statements in that

5    search warrant to establish probable cause, correct?

6    A     Depends on statements to be true and accurate, yes.

7    Q     Absolutely.  And, in fact, in this case, Gerald Goines

8    signed Exhibit Number 1, correct?  Swore to the facts in that

9    affidavit?

10   A     Yes.

11   Q     In addition to that, Judge Marcum himself said, had those

12   facts been in the affidavit, he would not have signed the

13   affidavit, correct?

14   A     He relied on information about a C.I. buy on January 27,

15   2019.  That's why he signed it.

16   Q     And, finally, you don't have to be a narcotics officer to

17   know that it's not okay to have sex with your C.I.s, correct?

18          **MS. DEBORDE:**  Objection, your Honor; asked and

19   answered and irrelevant.

20          **THE COURT:**  You already got that in.

21          **MR. HAMDANI:**  Thank you, your Honor.

22          Your Honor, I'll pass the witness.

23          **MS. DEBORDE:**  Very briefly.

24          //

25          //

Brown - Recross / By Ms. DeBorde                    85

<strong>RECROSS EXAMINATION</strong>

**BY MS. DEBORDE:**

Q    Have you had a chance to observe the video of the

statements, if you want to call it that, in Government's

Exhibit Number 3 given by then Officer Goines?

A    Yes.

Q    And it was made very clear at that time on video that

Mr. Goines was under heavy medication?

A    I don't remember the details but I don't remember that for

a fact but --

Q    Okay.  And was in a great deal of pain?

A    I don't remember that for a fact but it was probably on

the video if that's what they're saying.

        **MS. DEBORDE:**  Pass the witness.

        **MR. HAMDANI:**  Nothing further, your Honor.

        **THE COURT:**  You may step down.

        **THE WITNESS:**  Thank you, ma'am.

    **(Witness steps down)**

        **THE COURT:**  Does the Government have any other

witnesses?

        **MR. HAMDANI:**  No, your Honor, the Government doesn't

have any more witnesses.  Pass.

        **THE COURT:**  Ms. DeBorde, are you going to put on

evidence?

        **MS. DEBORDE:**  Yes, please.  May I proceed?

Burns-Pena - Direct / By Ms. DeBorde                86

1              **THE COURT:**  Please.

2              **MS. DEBORDE:**  At this time, we would call Shannon

3    Burns.

4          **SHANNON BURNS-PENA, DEFENDANT'S WITNESS, SWORN**

5                      **DIRECT EXAMINATION**

6    **BY MS. DEBORDE:**

7    Q    Ms. Burns, could you please identify yourself for the

8    record and for the Court by telling us your name and what it is

9    you do?

10   A    My name is Shannon Burns-Pena and I work at Burns Bail

11   Bonds and EZ Monitoring.

12             **THE COURT:**  I'm sorry --

13   Q    What is EZ --

14             **THE COURT:**  -- I didn't hear.  You work for what?

15             **THE WITNESS:**  Burns Bails Bonds and EZ Monitoring and

16   EZ Interlock.

17   **BY MS. DEBORDE:**

18   Q    What is EZ Monitoring?

19   A    We do electric monitoring of usually criminal defendants,

20   GPS ankle monitors and alcohol monitors.

21   Q    Okay.  And do you know the gentleman sitting next to me?

22   A    Yes, ma'am, I do.

23   Q    Who is that?

24   A    That's Mr. Goines.  He is one of our -- well, he's on bond

25   to us and he is also one of our GPS customers.

Burns-Pena - Direct / By Ms. DeBorde                    87

1   Q    Okay.  And so, in fact, what -- do you know the amount of

2   the bonds that your company wrote for Mr. Goines?

3   A    There were two 150,000-dollar bonds.

4   Q    For a total of?

5   A    Three hundred thousand.

6   Q    And is that for the same case which is already charged in

7   Harris County, Texas in State court?

8   A    Yes, ma'am.

9   Q    And what kind of an evaluation does your company go

10  through in determining whether or not you will write a bond for

11  someone?

12  A    We, especially on large bonds, look at everyone on a case-

13  by-case basis.  We try and look at the whole picture as far as

14  their stability in the community, their contacts to other

15  communities, their family and friends supporting them.  We look

16  at who their representation is, a whole long list.

17  Q    And why is that important to do for you if you're going to

18  write a 300,000-dollar bond on someone?

19  A    So we are on the line for the full $300,000 if he does not

20  appear in court when he's required to.

21  Q    All right.  And did you decide to write those bonds?

22  A    We did.

23  Q    Now, has Mr. Goines been compliant in every way with the

24  conditions of his bond in State court?

25  A    Yes, ma'am.

Burns-Pena - Direct / By Ms. DeBorde                88

1  Q    How long has he been on bond?

2  A    A little over two months.

3  Q    And did you also provide services -- electronic monitoring

4  for the State court?

5  A    Yes.

6  Q    And pursuant to that Court's order, he had to have an

7  electronic monitor?

8  A    Correct.

9  Q    What kind of monitor was placed on Mr. Goines?

10  A    It's a GPS ankle monitor.  So it tracks his whereabouts.

11  As long as the device is charged, we can see where he is at all

12  times.  He -- everybody's conditions are different.  He had a

13  curfew.  So we were able to monitor whether he was home during

14  the Court-ordered curfew or not and if he was keeping it

15  charged or not charged, if it was remaining on his ankle or if

16  he tampered with it in any way.

17  Q    Okay.  How can you tell if someone tampers with a device?

18  A    There's a fiber optic wire in the strap that sends a beam

19  of light back and forth every second.  If that beam of light

20  ever is disrupted and doesn't reach the other side of the

21  strap, we'll be notified within one minute.

22  Q    And how sensitive from a location standpoint is a GPS

23  ankle monitor like the one Mr. Goines is wearing?

24  A    It will depend on how many satellites the device is

25  communicating with at any given moment.  It takes one -- like

Burns-Pena - Cross / By Mr. Jones                    89

1    one pinpoint per minute.  So every minute it is locating him.

2    Say, for instance, there are three or four satellites that it's

3    communicating with at the time, there's going to be some drift

4    potentially in his location.  If there are eight to ten

5    satellites, it's going to be highly, highly accurate.

6    Q    And when you say, "Highly, highly accurate," can you tell

7    whether or not he's at his house?

8    A    Oh, yes.  I could tell what part of his house.

9    Q    Okay.  And has Mr. Goines been 100 percent compliant with

10   his conditions of bond in State court?

11   A    Yes, ma'am.

12   Q    And has he appeared for you when you have requested in

13   order to either put on the monitor or deal with a monitor in

14   any way?

15   A    Yes, ma'am.

16           **MS. DEBORDE:**  Pass the witness.

17           **MR. JONES:**  And, your Honor, I'll be doing the

18   questioning of this witness if the Court's okay with that.

19           **THE COURT:**  Go ahead.

20           **MR. JONES:**  Rob Jones for the United States.

21                       CROSS EXAMINATION

22   BY MR. JONES:

23   Q    Good afternoon -- I believe it's afternoon.  Good

24   afternoon, Ms. Pena.

25   A    Hi.

Burns-Pena - Cross / By Mr. Jones                    90

1  Q    I've just got a couple of questions to follow up.  On the

2  bond, that was on Mr. Goines' State case, correct?

3  A    Yes, sir.

4  Q    Okay.  And he was arrested on a complaint in that case,

5  right?

6  A    That's correct.

7  Q    Okay.  So there isn't an indictment yet in that case,

8  right?

9  A    I don't know for sure.  We don't look at whether they've

10 been indicted yet or not, honestly, as part of our evaluation.

11 So I don't know.

12 Q    Well, but if somebody doesn't ultimately get indicted,

13 that could end the case in the State; is that correct?

14 A    Yes.

15 Q    Okay.  And also they could be arrested on one charge on a

16 complaint that could be a serious charge and ultimately

17 indicted for something lesser; is that correct?

18 A    That's correct.

19 Q    Okay.  And the opposite could be true, right?

20 A    Yes.

21 Q    And on the Federal -- are you familiar with the Federal

22 system at all?

23 A    Very little.

24 Q    You-all don't write bonds for the Federal side, right?

25 A    We do but it's not nearly as common as State.

Burns-Pena - Redirect / By Ms. DeBorde                    91

1  Q    Okay.  And in the State, they typically have parole for

2  most offenses, correct?  Do you know that or maybe you don't

3  know that?

4  A    I don't really know the -- all the punishment ranges.

5  Q    Okay.  Did you know that in the Federal system, if an

6  individual is sentenced to prison, they're actually is no

7  parole?

8  A    I did know that.

9  Q    Okay.  And did you know that in this current Federal case,

10 Mr. Goines is facing the possibility of up to life in prison?

11 A    Yes.

12 Q    Okay.  And that if he did get life in prison, that would

13 be life without parole.  Is that your understanding?

14 A    Yes, sir.

15 Q    Okay.

16       MR. JONES:  That's all I have, your Honor.

17                    REDIRECT EXAMINATION

18 BY MS. DEBORDE:

19 Q    And being aware of all of the things the prosecutor has

20 just outlined to you, would your company still be willing to be

21 responsible for Mr. Goines if he was released on bond?

22 A    Yes, ma'am.

23       MS. DEBORDE:  Pass the witness.

24       THE COURT:  You may step down.  Thank you.

25       THE WITNESS:  Thank you.

Lanier - Direct / By Ms. DeBorde                    92

1          **MS. DEBORDE:**  And, your Honor, may she be excused?

2          **THE COURT:**  Yes, you may be excused.

3      **(Witness is excused)**

4          **THE COURT:**  Do you have any other witnesses?

5          **MS. DEBORDE:**  We do.  At this time, we would call

6   Elyse Lanier.

7          **THE COURT:**  Is Ms. Lanier in this courtroom?  Oh,

8   there you are.  Come in.  Come on forward.

9          **ELYSE LANIER, DEFENDANT'S WITNESS, SWORN**

10                    **DIRECT EXAMINATION**

11  BY MS. DEBORDE:

12  Q    Good afternoon, Ms. Lanier.  Could you please introduce

13  yourself to the Court and for the record by giving us your

14  name?

15  A    Okay.  I'm Elyse Lanier.  I am the widow of Mayor Bob

16  Lanier and a part-time employer of Gerald's for probably 25

17  years.

18  Q    And have you known then Gerald for approximately 25 years?

19  A    Yes.

20  Q    And when we say "Gerald," for the record, are you --

21  A    I'm sorry.  Mr. Goines.

22  Q    No, no, that's fine.  And are we talking about the

23  gentleman sitting next to me in green?

24  A    Absolutely.

25  Q    And how well would you say you've known Gerald Goines?

1   A    Well, I'd say very well.  He -- we got to know him when my

2   husband was mayor and he did some driving for us.  And then

3   when my husband had a double knee replacement 15 years ago,

4   Mr. Goines lived with us for probably three weeks.  My husband

5   didn't want to go to rehab and we thought Gerald being a great

6   big man, strong and that my husband admired so much and he came

7   and lived with us and he actually had my husband walking from a

8   double knee replacement in, like, two to three weeks.

9   Q    Is Gerald Goines someone that you and family cares about

10  deeply?

11  A    Oh, my God.  Gerald is a gentle giant that we adore.  He

12  saw my husband until the day he died looking after him nights.

13  He now works with my children and my grandchildren.

14  Absolutely.  And I might add, if he and his wife wanted to come

15  live with me during this time, that's how much I trust him and

16  love him.

17  Q    So you trust him around your family?

18  A    My grandchildren and my children.

19  Q    And you trust him in your home?

20  A    Oh, absolutely.

21  Q    And if this Court felt that it would be important for

22  members who love Gerald in the community to be able to report

23  back to the Court about his compliance with any rules she

24  gives, you would be willing to do that?

25  A    Gerald follows the rules.  Gerald is a man of integrity

1    and honesty and I hate to even see him have that bracelet on

2    now.  He is not a murderer.

3    Q    And do you feel that you can assure this Court that he

4    will be where he is supposed to be?

5    A    Absolutely.  First of all, Gerald doesn't even want to fly

6    anywhere.  I mean, Gerald is -- he likes his work.  He likes

7    his family.  He loves his support family here.  Gerald's not

8    looking to go anywhere.  He just wants to be able to do what he

9    does best which is protect people.

10   Q    And you heard a lot of things in this courtroom today.

11   A    Yes.

12   Q    Even though you've heard these things and how serious the

13   prosecution believes the punishment could be in this case, do

14   you believe in any way that Gerald would fail to appear in

15   court as directed?

16   A    Oh, he absolutely -- Gerald will be wherever he's supposed

17   to be.  He is -- he's what he says he is.

18   Q    And will you commit to this Court if given the opportunity

19   to assist in making sure that happens?

20   A    Oh, absolutely.  I -- yes.

21   Q    Thank you.

22           **MS. DEBORDE:**  Pass the witness.

23           **THE WITNESS:**  Thank you, Judge.  Thank you.

24           **THE COURT:**  He gets to ask questions in case he has

25   any.  So are you?

1          **MR. JONES:**  I have a few, your Honor.

2          **THE WITNESS:**  Sure.

3                          **CROSS EXAMINATION**

4     BY MR. JONES:

5     Q    Good afternoon, ma'am.

6     A    Good afternoon.

7     Q    Are you aware of the specific allegations in this case,

8     ma'am?

9     A    Well, I know what I've read in the paper.  I know what

10    I've heard this morning.  I know what -- I hear what people

11    say.  Yes.

12    Q    Okay.  Did you know -- do you know the specifics of

13    whether Officer Goines has been -- when he was an officer, was

14    accused of any type of misconduct other than this case while he

15    was a police officer?

16    A    Well, let me tell you what I do know.  I don't know that

17    but I do know that like three years before all of this -- I

18    think it was three years -- he was --

19    Q    Well, just to move it along, so the answer is you don't

20    know?

21    A    But he's the poster man for the Police Department like

22    three years ago.  It's truly important.

23    Q    Okay.  So -- but you don't know whether he's been accused

24    of other misconduct, do you?

25    A    No.

Lanier - Cross / By Mr. Jones                                    96

1   Q    Okay. And did you know in 2013, he was accused of falsely

2   claiming an individual pointed a gun at him in an alleged road

3   rage incident?  Did you know about that?

4   A    I have -- I don't know what you're talking about.

5   Q    So you hadn't heard about that?

6            MS. DEBORDE:  Your Honor, I'm going to object to

7   that.  There's no evidence to that effect.

8            MR. JONES:  Your Honor, this witness has said she

9   knows the Defendant.  I want to see exactly how well she knows

10  this Defendant before she's making these statements about him

11  in court and we do have a good-faith basis for asking all of

12  these questions.

13           THE COURT:  I'll allow it.

14  BY MR. JONES:

15  Q    Okay.  So just to follow up, ma'am, you weren't aware of

16  any allegation like that being made against Officer Goines when

17  he was an officer, did --

18  A    I was not.

19  Q    Okay.  And did you -- were you aware that there was ever a

20  case where he had made that allegation that somebody had

21  pointed a gun at him in a vehicle in a road rage incident and

22  that the subsequent investigation did not turn up any gun in

23  that vehicle or on that person's -- in that person's

24  possession?  Did you know about any of that?

25  A    No.  I said, "No."

Lanier - Cross / By Mr. Jones                               97

1  Q   Okay.  So you didn't know that the Grand Jury actually

2  no-billed the case against that individual who was supposedly

3  pointing a gun at the officer?

4        **MS. DEBORDE:**  In light that a Grand Jury has found

5  that there is no probable cause to believe that such an

6  incident occurred, we would ask the Court strike that evidence

7  and disregard it for purposes of this hearing.

8        **MR. JONES:**  And, your Honor, there was no probable

9  cause that the individual pointed the gun at Officer Goines.

10        **THE COURT:**  Okay.  This is a detention hearing.  I'm

11  not deciding guilt or innocence.  All I am deciding is whether

12  or not he can be released on bond.

13        **THE WITNESS:**  Please release him.

14        **THE COURT:**  Move along, Mr. Jones.

15  **BY MR. JONES:**

16  Q   Now, so on the night of January 27th, which I guess would

17  have been the -- I should say the night of January 26th, 2019

18  into the early morning hours of January 27th, 2019, Officer

19  Goines was working -- and, again, he's still an officer -- at

20  your property; is that correct?  Do you recall?

21  A   Yeah, I mean, he's been working for us for years.

22  Q   Okay.  Do you recall that he got off duty that night at

23  about 1:12 a.m. on the early morning of the 27th of January of

24  2019?  Does that make sense to you?

25  A   No.

Lanier - Cross / By Mr. Jones                     98

1          **THE COURT:**  Are you aware?  Were you aware that he

2    was -- that he got to your property?  Is that the question?

3    **BY MR. JONES:**

4    Q    He left that job at approximately 1:12 a.m. on --

5          **THE COURT:**  Which job?

6    Q    -- January 27th.

7          **MR. JONES:**  Working for the Laniers, your Honor.

8          **THE COURT:**  He left the --

9          **MR. JONES:**  I was wanting to know if she knows was he

10   working that night.

11         **THE WITNESS:**  I don't know if I -- I would have to

12   look at my calendar but, you know, Gerald -- Mr. Goines was --

13   he would drive me a lot and -- but I don't know the dates.  I

14   mean, I don't have reason to keep them.

15   **BY MR. JONES:**

16   Q    Okay.  And so you wouldn't know where he was on the 27th

17   of January of 2019 though.  Was that a fair statement?

18   A    That's a fair statement but, again, I don't have my

19   calendar in front of me.

20   Q    Okay.  And would it also be a fair statement to say that

21   you didn't accompany him on any of his police duties, did you?

22   A    Oh, no.

23   Q    I mean, that was his job, right, I mean, his primary job?

24   A    That was his job but he was very protective of us.  I

25   mean, they were separate.  He was a police officer working

1    narcotics and then he worked for us and my children.

2    Q    Okay.  So anything that he, you wouldn't have known it

3    because you wouldn't have been with him.  Is that a fair

4    statement?

5    A    I was not with him when he was performing his police

6    duties to make life a little better for all of those who want

7    drug addicts off the street.

8    Q    Okay.  And you didn't personally interview any of the

9    people who live on Harding Street in Southeast Houston?

10   A    Did I interview the people?

11   Q    You didn't do that, right?  You heard the testimony about

12   that today, right?

13              THE COURT:  Mr. Jones --

14              THE WITNESS:  I -- no.

15              THE COURT:  -- Mr. Jones.

16              MR. JONES:  Yes, your Honor.

17              THE COURT:  You can move along.

18              MR. JONES:  Yes, your Honor.

19   BY MR. JONES:

20   Q    And would it also be fair to say that when Officer Goines

21   was working with the Police Department, he would not discuss

22   the details of cases with you?

23   A    No.

24   Q    So he did -- he wouldn't discuss them with you, correct?

25   A    No.  Nor would I want to know.

Robins - Direct / By Ms. DeBorde                     100

1   Q    All right.

2                **MR. JONES:**  That's all we have, your Honor.

3                **THE COURT:**  You may step down.  Thank you.

4                **THE WITNESS:**  Thank you very much.

5                **THE COURT:**  Thank you, Ms. Lanier.

6                Oh, you have something else?

7                **MS. DEBORDE:**  We do.  Oh, no, no, not for this

8   witness.  She may sit down.

9                **THE COURT:**  Oh, no, okay.  Thank you.

10               **THE WITNESS:**  Thank you.

11               **MS. DEBORDE:**  Thank you so much, Ms. Lanier.

12          **(Witness steps down)**

13               **THE COURT:**  Okay.  Do you have another witness?

14               **MS. DEBORDE:**  Yes, I do.  At this time, we would call

15  Kevin Robins.

16           **KEVIN ROBINS, DEFENDANT'S WITNESS, SWORN**

17                    **DIRECT EXAMINATION**

18  **BY MS. DEBORDE:**

19  Q    Mr. Robins --

20  A    Yes.

21  Q    -- would you please introduce yourself to the Court by

22  giving us your name and what it is you do?

23  A    Sure.  My name is Kevin Robins.  I'm in the real estate

24  business.  I'm Elyse Lanier's son.

25  Q    Okay.  And do you know the gentleman sitting next to me?

Robins - Direct / By Ms. DeBorde                     101

1   A    I do.

2   Q    How do you know him?

3   A    I've known -- I worked for my step-father starting in

4   2001.  So I've spent a lot of time with Mr. Goines around the

5   house.

6   Q    Okay.  And what kinds of things did Mr. Goines do for your

7   family?

8   A    Whatever we asked.  He did everything.  I mean, it would

9   be very hard for me to narrow that answer down.  Whatever was

10  requested, he did.

11  Q    Okay.  And so he was a long-time committed employee for

12  your family?

13  A    Yes.

14  Q    And over the course of that employment, do you feel like

15  you've gotten to know the man that Mr. Goines is?

16  A    Yes.

17  Q    And what do you think of his character?

18  A    Exceptional -- exceptionally high character.

19  Q    And why do you feel that way?

20  A    Primarily because when I saw him with my step-father both

21  -- especially near the end of his life, the care that he

22  provided for him and the way he treated him was very special.

23  Q    Now, we've heard a lot of things in court this morning

24  about statements that the Government asserts are not true.  As

25  far as your interactions with Mr. Goines, have you found the

Robins - Direct / By Ms. DeBorde                    102

 1  things that he says to you to be honest?

 2  A    I have found them absolutely entirely honest, yes.

 3  Q    And have you -- aside from him being an employee, do you

 4  care about him as a person?

 5  A    Very much so.

 6  Q    How does your whole family feel about him?

 7  A    We love him very much.

 8  Q    And will you continue to employ him if this Court sees fit

 9  to release him on bond?

10  A    We will.

11  Q    And even in his injured state, is he still able to

12  function as your employee?

13  A    Absolutely, yes.

14  Q    And has he, in fact, continued to work for your family

15  during the two months he's been on bond?

16  A    He has.

17  Q    For the State court, to clarify?

18  A    Yes.

19  Q    Would you commit to this Court that you would help ensure

20  that Mr. Goines would be where he is supposed to be for any

21  court appearance or any court proceeding as required?

22  A    Yes.

23  Q    And are you willing -- and you're sitting up here

24  testifying --

25  A    Yes.

Robins - Cross / By Mr. Jones                      103

1   Q     -- to stake your own reputation --

2   A     Yes.

3   Q     -- on the idea that he would return as directed?

4   A     Absolutely.

5   Q     Do you feel that Mr. Goines is in any way a danger to the

6   community?

7   A     Not at all.

8   Q     Do you allow him around your own family?

9   A     Yes.

10  Q     And will you continue to do so?

11  A     Absolutely.

12           **MS. DEBORDE:**  Pass the witness.

13           **MR. JONES:**  Very briefly, your Honor.

14                     **CROSS EXAMINATION**

15  **BY MR. JONES:**

16  Q     Good afternoon, sir.

17  A     Good afternoon.

18  Q     How much does your family pay Mr. Goines a month?  Do you

19  know approximately?

20  A     No.

21  Q     Any range, any idea?

22  A     I don't.  It's a -- it depends on the month and how many

23  hours he works and he works some for my mother and some for my

24  sister and I could get records but I don't know off the top of

25  my head.

Robins - Cross / By Mr. Jones                    104

1    Q    But since he retired from the Police Department, has your

2    family continued to employ him?

3    A    Yes, but primarily that's been my sister and her husband

4    which I consider part of my family.

5    Q    Sure, sure.  And as far as you know, has he actually been

6    paid money from your sister or her husband, anybody else in

7    your family since that time?

8    A    I don't know.  I think so but I haven't seen check stubs

9    or -- I'm not sure but I would assume so.  I know he has been

10   there working.  So I assume they're paying him but with my

11   sister, you never know.

12   Q    Fair enough.  But you wouldn't expect Mr. Goines to tell

13   the Court he was unemployed and didn't have any other income

14   other than what his retirement income was, would you?

15   A    I don't know what he would tell the Court.  Are you asking

16   me if --

17   Q    Well, no, no, no.  If he's working for your family, you

18   would expect he would tell the Court that, right?

19   A    Yes, if they asked, sure.

20   Q    Right.  I mean, that's all.

21   A    Okay.  Sorry.

22          MR. JONES:  That's all we have, your Honor.

23          THE COURT:  You may -- oh, do you have more?

24          MS. DEBORDE:  No, just if he may be excused.

25          THE COURT:  Yes, you may step down.

1          **THE WITNESS:**  Thank you.

2      **(Witness steps down)**

3          **THE COURT:**  Do you have any other witnesses?

4          **MS. DEBORDE:**  We do.  At this time, we would call

5   Rico Garcia.

6              **RICO GARCIA, DEFENDANT'S WITNESS, SWORN**

7          **THE COURT:**  Before you start, Ms. DeBorde, I do have

8   another hearing that's supposed to start at 1:00 o'clock.  So

9   how much longer do you think you're going to go?  How many more

10  witnesses do you have?

11         **MS. DEBORDE:**  Including this witness, two.  And I do

12  have some proffered information.  The Court has a bench copy

13  already along with a short additional proffer.

14         **THE COURT:**  And are you going to put on any

15  additional evidence?

16         **MR. HAMDANI:**  No, your Honor.

17         **THE COURT:**  Okay.  So two more witnesses.  Do you

18  think -- can both of you commit to be finished by 1:30?

19         **MR. HAMDANI:**  Absolutely.

20         **MS. DEBORDE:**  Yes.

21         **THE COURT:**  Yes?

22         **MS. DEBORDE:**  Yes.

23         **THE COURT:**  Okay.  Go ahead.

24  //

25  //

**DIRECT EXAMINATION**

1

**BY MS. DEBORDE:**

2

Q    Mr. Garcia, could you please introduce yourself to the

3

Court and tell us for the record what it is you do?

4

A    My name is Richard Garcia.  I'm a retired Houston Police

5

sergeant.  I served for 35 years and since my retirement, I've

6

been working for the Estate of Lester and Sue Smith.

7

Q    Okay.

8

       **THE COURT:**  You've been working for what?  I'm sorry.

9

       **THE WITNESS:**  The Estate of Lester and Sue Smith.

10

**BY MS. DEBORDE:**

11

Q    In what capacity?

12

A    Really, it's to interview the people that come on to the

13

property, make sure that they don't have any felony convictions

14

of any type.

15

Q    Okay.  Now, the gentleman sitting next to me is, of

16

course, Gerald Goines.  Do you know him?

17

A    Yes, ma'am, I do.

18

Q    How do you know him?

19

A    I've served with him roughly for the past 25 years in the

20

Narcotics Division.

21

Q    So you yourself were in the Narcotics Division for

22

approximately 25 years?

23

A    More like 20 but I transferred to other divisions but I

24

kept in contact with him during that time.

25

Garcia - Direct / By Ms. DeBorde                    107

1  Q    And what is your opinion of Mr. Goines' character?

2  A    Gerald Goines was -- is one of the best narcotics officers

3  in the city of Houston.  He's done a number of cases.  He's

4  gone above and beyond what is expected from the normal

5  narcotics officers that work up there.  He's an instructor.

6  Q    And do you know what he instructs?

7  A    Yes, ma'am, officer safety.  Actually, also taught on

8  handling the informants.

9  Q    And do you know how long he was planning on working for

10  the Houston Police Department when this occurred?

11  A    He had -- I had spoke with him and he said that he was

12  about to retire and that was back on January the 27th of this

13  year.

14  Q    You heard all of the testimony this morning in this

15  detention hearing.  Does that change your opinion about your

16  friend and colleague Mr. Goines in any way?

17  A    No, it does not.

18  Q    And in particular, you heard some testimony from a Federal

19  agent about narcotics investigations while you were here?

20  A    Yes, ma'am.

21  Q    And one of the questions asked of that Federal agent was,

22  is a heroin investigation different than some other type of

23  drug investigation?

24  A    Very much so.

25  Q    Why?

1   A    Heroin is a difficult case to work.  I specialized in

2   working heroin investigations since 1976 and it's a difficult

3   investigation because of their -- the propensity for the

4   suspects to be violent, also their unique ability to hide the

5   drugs and dispose of them right away.

6           **MS. DEBORDE:**  Your Honor, may I approach the witness?

7           **THE COURT:**  Yes.

8           **(Counsel approaches)**

9   **BY MS. DEBORDE:**

10  Q    There has been an exhibit admitted by the Government which

11  is marked as Government's Exhibit Number 3 which contains a

12  photograph of baggies of heroin.  Do these heroin baggies, just

13  in looking at this photograph, appear different to you in any

14  way than any other baggie of heroin you've ever seen?

15  A    No.

16  Q    How would describe Mr. Goines for the Court?

17  A    He is a consummate professional.  He looks very rough and

18  tough on the exterior but he's a -- as Ms. Lanier said, a

19  gentle giant.  He's very compassionate towards everyone he

20  encounters.

21  Q    And would you commit also to this Court to ensure that

22  Mr. Goines would appear as directed at any time and place as

23  required by the Court?

24  A    Absolutely.

25  Q    Do you have any reason to believe even without that

Garcia - Cross / By Mr. Khandelwal                    109

1   commitment from you that Mr. Goines would ever do otherwise?

2   A    He would follow the rules.

3   Q    And do you believe in knowing Mr. Goines for as long as

4   you have that he poses in any way any type of danger whatsoever

5   to the community?

6   A    No, ma'am, he does not.

7            **MS. DEBORDE:**  Pass the witness.

8            **MR. KHANDELWAL:**  Your Honor, Sharad Khandelwal and

9   I'll be taking this witness, your Honor.

10           **THE COURT:**  Okay.

11                        **CROSS EXAMINATION**

12  BY MR. KHANDELWAL:

13  Q    Good afternoon.  You had testified on direct examination

14  that --

15           **THE CLERK:**  Can you talk into the microphone, please?

16           **MR. KHANDELWAL:**  I'm sorry.  Can you hear me, your

17  Honor?

18           **THE COURT:**  Yes.

19  BY MR. KHANDELWAL:

20  Q    You testified on direct examination that the bags of

21  heroin in this case -- that one of the things you looked for in

22  this case is about how distinctive a bag is; is that right?

23  A    No.

24  Q    Is it important to note how distinctive a bag of heroin

25  is?

Garcia - Cross / By Mr. Khandelwal                    110

1   A    Well, not necessarily.  They're bagged in a number of

2   different ways, I mean, from balloons to tin foil to tissue.

3   You name it, they're going to put it in that type of packaging.

4   Q    And you'd agree with me that a witness can identify a bag

5   of heroin that they had previously handled; isn't that right?

6   A    For me --

7   Q    It's certainly possible, right?

8   A    For me, I've been doing it a lot of years and not from a

9   photograph.

10  Q    Right.  And if a bag had a distinctive color, that's a

11  factor that you would trust that a confidential informant could

12  identify something as being a bag that they had previously

13  handled; isn't that right?

14  A    Confidential informants will tell you what you want to

15  hear sometimes.

16  Q    So we shouldn't trust confidential informants?

17  A    Some I don't.

18  Q    We should rely on the truthfulness of the agent who's

19  sponsoring that confidential informant; is that right?

20  A    That's not necessarily true because the informant will

21  give you some information about where he goes and it's your job

22  as a case agent to -- some of these places you can't watch the

23  front door.  It's in a housing project.  You're going to stick

24  out.  So, you know, it's important that you -- you're going to

25  try to get to the location as close as you can.

Garcia - Cross / By Mr. Khandelwal                    111

1  Q    Right.  So it's important for the officer to try to lay

2  eyes on the CI as much as they possibly can?

3  A    Absolutely.

4  Q    And if the undercover -- if the officer wasn't anywhere

5  near where the purchase occurred, that would be a problem,

6  wouldn't it?

7  A    Yes, it would.

8  Q    If the undercover officer never searched the CI before

9  they go in to do a buy, that would be important wouldn't it?

10 A    It would be.

11 Q    And if they never searched the CI afterwards, that would

12 be important as well.

13 A    It would be.

14 Q    And the fact that they pick up drugs from the CI, that the

15 CI says was bought days before, that would be something that

16 would be questionable in your eyes, wouldn't it be?

17 A    If they said that, yes.

18 Q    And if there are drugs that are just found in a car by an

19 officer that haven't been properly tagged and deposited into

20 evidence, that would be something of concern to you as a long-

21 standing narcotics officer, isn't that right?

22 A    Well, in Gerald's case, he is --

23 Q    I'm asking in general.

24 A    -- in general, no.  Some of these officers have different

25 cases that they work.  It's not just one particular case.  So,

Garcia - Cross / By Mr. Khandelwal                          112

1  they may go from location to location to location.  Now you've

2  got three different sets of evidence that need to be tagged.

3  Q    And that evidence needs to be tagged and put into evidence

4  as quickly as possible, is that fair to say?

5  A    That is the policy.

6  Q    And if it were days later, that would be a problem

7  wouldn't it?

8  A    That would be.

9  Q    And that would be a comment on the officer's truthfulness

10  and reliability, wouldn't that be?

11  A    Or laziness.

12  Q    That's right.  You said that heroin investigations are

13  different, is that right?

14  A    Yes, sir.

15  Q    Are they different in the truthfulness that's required by

16  the officer?

17  A    No.

18  Q    Does that, in heroin investigations are officers allowed

19  to lie on search warrants?

20  A    Absolutely not.

21  Q    And that would be something that you would consider when

22  relying, when evaluating the reliability of a person, isn't

23  that right?

24  A    Yes.

25           **MR. KHANDELWAL:**  Nothing else, your Honor.

Sarofim - Direct / By Ms. DeBorde                    113

1          **MS. DEBORDE:**  Nothing further.

2          **THE COURT:**  You may step down, thank you.

3          **THE WITNESS:**  Thank you, your Honor.

4     **(Witness steps down)**

5          **MS. DEBORDE:**  And final witness, your Honor, is going

6   to be Christopher Sarofim.

7          **THE COURT:**  Can you spell the last name?

8          **MS. DEBORDE:** S-A-R-O-F-I-M.

9          **CHRISTOPHER SAROFIM, DEFENDANT'S WITNESS, SWORN**

10                      **DIRECT EXAMINATION**

11  **BY MS. DEBORDE:**

12  Q    Mr. Sarofim, and I hope I am pronouncing that correctly,

13  could you please introduce yourself to the Court and describe

14  what it is you do, and how you know Gerald?

15  A    Yes, my name is Christopher Sarofim, and I'm an investment

16  counselor and we employ Gerald at our house to provide security

17  and to help take care of our children and provide them guidance

18  as well.

19  Q    Now, you're aware, in light of all of these charges, the

20  state charges, and now of course the federal charges, that

21  Mr. Goines cannot and does not carry any type of weapon or

22  firearm.

23  A    Correct, I am aware.

24  Q    And does that change your desire to have him assist you in

25  your family life?

Sarofim - Direct / By Ms. DeBorde                                114

1   A     Not at all.  We definitely continue to want to have Gerald

2   available to help us.

3   Q     And you've heard all of the information that was elicited

4   from this agent here in court today.  Does that change your

5   opinion of Mr. Goines' character?

6   A     That doesn't change my opinion at all.

7   Q     And what is your opinion of Mr. Goines?

8   A     I think Gerald Goines is an outstanding person.  And he is

9   the first person we would call in terms of wanting security.

10  But not only that, we have two teenage children in the house

11  and Gerald was also the first person we thought of, and the

12  person we would most want, to help provide guidance to them as

13  well.

14  Q     And what type of guidance do you mean?

15  A     Guidance in that Gerald has a lot more knowledge,

16  information, and experience about aspects of the world that we

17  don't really come in to contact with.  And I think that's very

18  helpful to give a dose of reality that my kids have a somewhat

19  protected existed and Gerald has been incredible.  He's fully a

20  member of our family now.

21  Q     And considering that you have said he is fully a member of

22  your family, do you think it would be reasonable for Gerald to

23  view you as family as opposed to just an employer on some sheet

24  that they reported income, or employers to the government on?

25  A     I would hope so.

Sarofim - Direct / By Ms. DeBorde                    115

1   Q    Okay.  And when Gerald tells you he's going to be there,

2   wherever that is, is he there?

3   A    Always.

4   Q    Do you feel that you can count on his word?

5   A    Always.

6   Q    And like the other witnesses, can you commit to this Court

7   that you will assist in guaranteeing that Mr. Goines will be

8   where he needs to be when he's told to be there?

9   A    Yes, I will.

10  Q    And do you believe, even without that commitment, that he

11  would do it anyway?

12  A    Yes, I do.

13  Q    And will you continue to allow Mr. Goines in your home and

14  in your family life, even in light of what you've heard about

15  these allegations?

16  A    Absolutely, and we'd like to see him back there as soon as

17  possible.

18  Q    And about that, do you find that his services to you as an

19  employer are valued and needed in your home?

20  A    Yes, we do.

21  Q    And do you know whether or not he still has any ongoing

22  medical treatment?

23  A    Actually, I can't state the current state, I know the

24  number of surgeries, I mean, was unbelievable that he's gone

25  through since the incident.

Sarofim - Cross / By Mr. Khandelwal                    116

1   Q    And even though he may have to have breaks and go to the

2   hospital, will you continue to commit to be involved in his

3   life?

4   A    Absolutely.

5   Q    One last question, do you believe, even in light of

6   everything that you've heard, that there is any risk whatsoever

7   that Mr. Goines would be any sort of danger to any community at

8   all?

9   A    I don't believe there's any risk whatsoever.

10          MS. DEBORDE:  Thank you.  Your Honor, pass the

11  witness.

12          MR. KHANDELWAL:  Very briefly, your Honor.

13                      **CROSS EXAMINATION**

14  BY MR. KHANDELWAL:

15  Q    I'm sorry, I wasn't following completely.  Are you saying

16  that officer, or former officer Goines, is currently employed

17  with you and your family?

18  A    Yes.

19  Q    And he's been employed since he retired from HPD?

20  A    Yes.

21  Q    And approximately --

22  A    And before then, as well.

23  Q    -- fair enough.  And approximately how much is he making a

24  month from you?

25  A    So, he makes, I think we're paying $50 an hour and he

1  works typically on weekends for about 8 hours each day.

2  Q    So 16 hours a week, approximately?

3  A    Yes.  So, that's $800 a week, roughly.

4  Q    You're better at math than I am.  Okay.  You also

5  testified on direct examination that you sat through the

6  hearing today, is that right?

7  A    Yes.

8  Q    And you had a chance to hear the allegations made in open

9  court about officer Goines, is that right?

10 A    That's correct.

11 Q    And you heard the allegations, or the indictment, was

12 handed down by a grand jury in this case, is that right?

13 A    Yes.  I'm, I don't really focus on that, but okay.

14 Q    Okay.  And you understand that the defendant is being

15 charged with, potentially lying on a search warrant, is that

16 right?

17 A    That's what it sounds like.

18 Q    It's important to you to employ people of good character,

19 is that correct?

20 A    That is correct.

21 Q    And one of the things that you look at about character is

22 truthfulness, isn't that right?

23 A    That is correct.

24 Q    And the fact that former officer Goines lied on a search

25 warrant, sworn oath and lied, that doesn't trouble you?

1  A    I think you still have yet to prove that.  I trust

2  officers Goines entirely.

3  Q    So, regardless of the evidence you heard and the grand

4  jury indictment, you want to support your friend here, is that

5  right?

6       **(Pause)**

7  A    Sorry, I don't believe I heard --

8  Q    Is that what you're --

9  A    -- evidence from a grand jury indictment.

10      **THE COURT:**  Rephrase the question.

11 Q    Do you understand what an indictment is?  I mean that

12 sincerely.  Do you understand what the indictment is in this

13 case?

14 A    Yes.

15 Q    And it's issued by a grand jury?

16 A    Yes.

17 Q    And the grand jury's heard evidence in this case?

18 A    Yes.  I guess my point is I understood the indictment; I

19 didn't understand any of their, the evidence provided or,

20 because I wasn't there.

21 Q    Right.  And you've heard the testimony of a sworn FBI

22 agent in this case, is that right?

23 A    That's correct.

24 Q    And that agent has testified about various lies that were

25 made in the search warrant, is that right?

Sarofim - Cross / By Mr. Khandelwal                    119

1    A    I heard his testimony.

2    Q    Right.  And that doesn't trouble you?

3    A    It does not.

4          MR. KHANDELWAL:  Thank you.  Your Honor, no further

5    questions.

6          MS. DEBORDE:  Nothing further, may he be excused?

7          THE COURT:  Yes.

8          THE WITNESS:  Thank you.

9          MS. DEBORDE:  Thank you, your Honor.  Also, that

10   concludes our live witness presentation.  We have marked three

11   exhibits which we've also provided to the prosecution and also

12   provided a copy to the Bench.  We would like to offer those

13   into evidence for this hearing at this time.

14         THE COURT:  Would you want to tell me what these are?

15         MS. DEBORDE:  Yes.  The first exhibit, which is

16   Defendant's Exhibit number 1, is a collection of character

17   letters from additional witnesses who could also testify about

18   knowing Mr. Goines, his reputation in the community,

19   reliability, and dependability in terms of coming to court and

20   reputation for non-violence.

21         The second exhibit, or excuse me, yes, the second

22   exhibit that we wish to offer into evidence is Defendant's

23   Exhibit number 2.  This is a collection of commendations from

24   the Police Department over a series of years.  These

25   commendations are awards and recognition for his excellent

1    service to the Houston Police Department.  Some of them come

2    from members of the community talking about their own personal

3    experiences by way of character reference from Mr. Goines and

4    his service to them.

5            The third exhibit, is a collection of approximately

6    ten years' worth of bi-annual evaluations of Mr. Goines by the

7    Houston Police Department where he has been employed for

8    approximately 34 years.  We didn't go back that far to provide

9    you with that stack of records, but we have approximately ten

10   years' worth here.  As the Court can see, they're all

11   excellent.  But, beyond the excellent reviews, the supervisors

12   who are employees of the Houston Police Department have

13   provided, in addition, in each of these evaluations, comments

14   about Mr. Goines' reputation in the community, among other

15   officers, and his ability to do his job and follow

16   instructions, which we believe would be relevant for the

17   Court's consideration.

18           Finally, there is no exhibit, but we would proffer

19   for the Court that Mr. Goines is still undergoing surgeries.

20   He has a surgery scheduled in the next couple of weeks to deal

21   with problems he's experiencing from being shot in the face and

22   neck during the raid which has been the subject of today's

23   hearing.  He has currently an infection that needs to be dealt

24   with through surgical procedures and needs to have that surgery

25   promptly.  He will then have an additional series of surgeries.

1   There is at least one currently planned, but it must wait until

2   after the surgery I've just described before it can be

3   completed.

4           In addition to the witnesses that we've called, in

5   the interest of time, there are additional family members and

6   friends, including Mr. Goines' wife present here in the

7   courtroom who have all committed to ensuring that they will

8   assist the Court in making sure that Mr. Goines is present when

9   and as needed, and that he can follow any conditions that this

10  Court sets.  And that concludes our proffer.

11          **THE COURT:**  Okay.  Are we ready to proceed to

12  argument?

13          **MR. HAMDANI:**  We are, your Honor.

14          **THE COURT:**  All right.

15          **MR. HAMDANI:**  May it please the Court, lying to the

16  Courts, that's what Gerald Goines did.  He lied.  On January

17  28th, 2019, he lied on a search warrant.  He lied about a CI.

18  He lied about what that CI saw, he lied about even being with

19  that CI.  That lie led, eventually, to the deaths of two

20  homeowners,  Rhogena Nicholas and Dennis Tuttle.  That lie led

21  to the injury of his fellow officers.  That lie was not the

22  only lie that Gerald Goines would make before or after.

23          Your Honor, when looking at the nature and

24  circumstances of the case, when looking at the nature and

25  circumstances of Gerald Goines, there's one thing that's become

1   clear throughout this picture, is that Gerald Goines liked

2   being a police officer.  In 1984 he was a police officer.  In

3   1984 he committed to take an oath, an oath to uphold the law,

4   an oath to uphold the Constitution.  But, since that oath, your

5   Honor, Gerald Goines has also taken that power, a power that

6   should be taken seriously, a power as a police officer and used

7   it to his advantage.

8           He used it to his advantage on January 28th, 2019

9   when he led his fellow officers, who didn't know about the lies

10  he had made, and he led them into a fire fight that led to the

11  death of those homeowners and led to the injury of his fellow

12  officers.

13          Your Honor, he also lied of a tactical plan that he

14  gave to his fellow officers before he went over there.  He also

15  lied on the police report that he filed before he went over

16  there.  Gerald Goines was talked about as somebody who has a

17  separate life from those he works with.  That's right.  He had

18  a separate life.  A life full of lies.  Your Honor, when he

19  approached that door on January 28th, 2019, those lies had

20  become a powder keg.  A powder keg that was ignited.  A powder

21  keg that blew up, a powder keg that once that door was slammed

22  in and the screams started, and the shots were fired, people

23  got killed.

24          But the lies didn't stop there.  No, your Honor.  Two

25  days later, when approached, he lied again.  He lied to

1   investigators about there being a CI and who that CI was.  The

2   next day he lied again.  And then on February 13th, he wrote

3   down his lies in a videotaped interview.  But this time he said

4   it wasn't CI Number 1 or CI Number 2, it was him.  Trouble is,

5   he can't escape the cellphone data, he can't escape the

6   investigation.  And as you heard from Special Agent Brown, he

7   was nowhere near that location.

8        Those lies that only have continued, those lies have

9   only obstructed the investigation has been charged, but on top

10   of that his lies also related to not just search warrants, or

11   lies to a Magistrate Judge, those lies dealt with how he dealt

12   with confidential informants.

13       Your Honor, he lied on another search warrant, the

14   Napoleon Street search warrant.  And when he lied, he lied with

15   CI Number 2.  CI Number 2, who he had a sexual relationship

16   with.  Something that is forbidden if you're a case agent for

17   the confidential informant.

18       Your Honor, on top of all of that, his vehicle was

19   searched.  And what they found in his vehicle were drugs, crack

20   cocaine, ecstasy, pot, and a stolen firearm.  The lies coupled

21   with the activities he took place, that took place on January

22   28th, 2019 aren't the actions of a law enforcement officer who

23   swore to uphold the laws and the constitution of the United

24   States, no your Honor, those are the actions of but a common

25   criminal.

1          Your Honor, the danger here has already shown to the

2   community.  The danger he showed while wearing a badge, we

3   argue would continue.  The danger he has shown by obstructing

4   investigations, by lying to a Magistrate Judge, we argue will

5   continue after today.

6          In addition to that, your Honor, he is 55 years old.

7   He is looking at life imprisonment.  If convicted, the

8   possibility of life without parole.  Even a significant

9   sentence, not even life, would essentially be a life sentence

10  to Gerald Goines.  Now, he may argue, well, I've been charged

11  by the state, that's a complaint.  In this case, we have a

12  federal indictment with some serious civil rights charges.

13         Finally, your Honor, I want to address, kind of, the

14  factors individually, in 13 United States Code 3142(g).  The

15  United States, of course, would argue there are no conditions,

16  not even a combination of conditions that could do two things;

17  that could number one, secure his appearance his court, but

18  also protect the community.  The community whose trust he

19  violated on so many occasions.  Your Honor, first of all, when

20  you look at the nature and circumstances of the offense

21  charged, I've already talked about the gravity of the sentence,

22  but also this is a case that involves firearms.  It's something

23  under 3142 this Court should consider.  And in this case,

24  firearms were used, firearms were brought to that house, that

25  powder keg was lit and people died.

1          As you've also seen, the weight of the evidence

2    against Gerald Goines is vast and it's growing.  In addition,

3    when it comes to the history and characteristics of the person,

4    the defense put up several character witnesses, many of those

5    who employ Gerald Goines.  But, they would also tell you they

6    don't know what he does in his work.  They don't what he does

7    in that separate life.  In fact, you heard Ms. Lanier say he

8    has a separate life, I don't know what that is.  That's right,

9    it's a separate life, your Honor, that we would argue is more

10   or less defined by several lies.

11        **THE COURT:**  Just a second.  We have the next hearing,

12   want to put him in the jury box?

13        **(Pause)**

14        **THE COURT:**  Okay.  Mr. Hamdani, I don't want to

15   interrupt your remarks, but I really want you to focus, if you

16   can, on what you think the continuing danger to the community

17   is.

18        **MR. HAMDANI:**  Yes, your Honor.  Absolutely.  So, your

19   Honor, I'd say the big thing is he's a flight risk.  Because,

20   again, he may have been charged by the state, but because of

21   his, what he's looking at in the federal charges, because of

22   the seriousness of the offense what he's facing, and the fact

23   that it involved a firearm, the fact that he's looking at up to

24   life in prison, that's one big thing.  We, the United States,

25   would argue that he is a flight risk.

1         But on top of that, your Honor, we'd also argue he's

2    a danger.  His whole, all of his actions that have led him here

3    today, all of those actions stem from lies to the Court, lies

4    to on search warrants, lies about what he's going to do next.

5    This is a man, for example, who had an inappropriate

6    relationship with his CI's, who's able, who's willing to break

7    that barrier.  And your Honor, we would argue he'll continue to

8    break that barrier to his advantage.  He wore that badge, when

9    he wore that badge, he used it to his advantage by breaking

10   those barriers, by lying to folks to get what he wanted.  We

11   would argue that he's still a danger to this community and he

12   will be a flight risk if he's allowed to get out because of all

13   of those different issues.

14         So, your Honor, you also heard from many of the folks

15   he worked for who also said, well, they would stake their

16   reputations to make sure he'd appear here.  When you're looking

17   at life in prison, you're not going to care about somebody

18   else's reputation.  He will continue, your Honor, as we've

19   said, with the lies he's already demonstrated that got him here

20   today.  For those reasons, your Honor, we believe there aren't

21   a sufficient combination of circumstances that would ensure,

22   number one, his appearance here in court, but also that will

23   protect the community from the danger, the danger that we've

24   already seen happen.  Thank you.

25         **MS. DEBORDE:**  Your Honor, it's disappointing that the

1  government would come in, in a detention hearing, and imply in

2  front of a room full of people that an indictment is anything

3  more than an accusation.  It's just a fancy accusation.  And we

4  are eager to get our day in court so that we can actually try

5  this case.  It's a complicated case.  We've heard from one

6  individual who wasn't even involved in the interviewing of the

7  witnesses that this agent talked about on the stand today.  But

8  there is going to be, a timeframe where we are going to need to

9  do an enormous amount of work to cull through the investigation

10  that was done by multiple agencies in this case to make sure

11  that we can be ready for trial.  And Gerald Goines is going to

12  need to be there to assist in ferreting out the difference

13  between what is fact and what is fiction.

14          And the government, unfortunately, wants to believe

15  this very salacious story about what they think happened.  That

16  there were these crazy lies that were done, in order for what?

17  If the Court sits and thinks about why on earth any of this

18  makes sense, I suggest that you'll come up empty.  Here's a man

19  who is nearing retirement, who is now accused by this, by the

20  government, of this incredibly salacious, terrible crime.  And

21  they've implied that his, according to them, activities caused

22  the death of two individuals.  It makes no sense.  What on

23  earth would this man have to gain from that scenario?

24          The reality is, as we've heard, from the agent who

25  testified, that there was a 911 tip.  Not just one, but

1    multiple calls, indicating that the individuals in that Harding

2    Street location were dealing some of the scariest drugs can be

3    dealt in our communities.  This 911 caller called not once, not

4    twice, but three times.  This 911 caller alerted police, who

5    are responsible for protecting the public, that the individuals

6    at that location, the suspects, had not just guns but machine

7    guns.  We now heard from the agent in this case that there were

8    in fact guns found at that location.  And what did the

9    individuals in that home do when approximately 24 uniformed

10   police officers piled out of clearly marked HPD vehicles?

11   These individuals cursed at the police who were clearly

12   identifiable, fully aware that these individuals were

13   communicating with them, they were communicating back.  This

14   individual knew that they were police, and from the back of the

15   house knew why they were there.

16          We also know that the shots fired, some of which

17   ended up shooting Mr. Goines in the face, came from the

18   suspects in that home.  These were people who were armed to the

19   teeth and ready for the police at all costs.  And they fired

20   until the police had it stopped.  But, in the process,

21   Mr. Goines who raced into that house to drag one of his men out

22   because he heard these shots fired, did so when the rest of the

23   world would run away.  He ran in because he cares about the

24   people that he worked with.  And as we know from the witnesses

25   in this case, he cares about the people in this community.

1          He's got not just a short tenure of exposure to the

2    individuals that took the time out of their day to come and

3    tell you how they know Mr. Goines and why the love him, but

4    decades.  Decades of exposure to this man.  And the Court now

5    has, also, the reviews from a police department that employed

6    him for decades, and knows what kind of an individual he is.

7    And all of these individuals, and the reviews that you'll see,

8    and the character letters that you see will tell you the same

9    thing, that he will be where he says he's going to be when he's

10   supposed to be there.

11         The witnesses that came to court tell you that they

12   trust him enough to be around their families and their

13   children.  And not only just to be around them, but to provide

14   guidance that you would expect an adult to offer, and they

15   still do even hearing the allegations from the government.

16         But if that's not enough, we've heard from Ms. Burns

17   who works for a company that provides electronic leg monitoring

18   and has done so in a case where Mr. Goines, on just a charge,

19   is exposed in the State Court system to life imprisonment just

20   like these allegations here.  And what did he do?  He started

21   cooperating as soon as he could.  He reached out to the Houston

22   Police Department asking them to come to him.  He continued to

23   do everything that officers asked him to do and more.  He

24   showed up in court at every time he was supposed to do so, and

25   he is on his electronic leg monitor that can tell you what room

1    of his house he is in.  He complied with all of the rules and

2    all of the curfew requirements that that court, in the State

3    Court system had put forth for him.  And a bonding company who

4    wrote a $300,000 bond awarded this man, is willing to stand by

5    him and continue to promise you that he will be back.

6           We've also heard from people that love him and know

7    him, that he is a gentle giant.  He can be trusted to be out in

8    the community and continue to assist in the preparation of his

9    own defense.  And not only can he be out in the community, they

10   want him there as a valued friend, family member, and employee.

11   There would be not ends of justice served to either the

12   community or the system in having Mr. Goines sit in custody

13   while this case is pending in court.  Thank you, your Honor.

14           **THE COURT:**  Anything else?

15           **MR. HAMDANI:**  Nothing, your Honor.  I say it's 1:30,

16   I stick to my agreement.

17           **THE COURT:**  Okay.  Well, it's a very difficult

18   decision, and I am going to take it under advisement.  I'm

19   going to look at the rest of these exhibits that the defendant

20   has offered and then I will make my decision.

21           **MS. DEBORDE:**  Thank you, your Honor.  May I be

22   excused?

23           **MR. HAMDANI:**  Thank you, your Honor.

24           **THE COURT:**  You all may be excused.  Thank you.  I

25   want to just say, for the record, really excellent advocacy.

1  Really I want to say, not to insult anybody else who may be in

2  the room, some of the finest I've seen since I've been on the

3  bench.  But thank you.

4          **MR. HAMDANI:**  Thank you.

5      **(Proceeding ended 1:29 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          <u>November 27, 2019</u>

        Signed                                                            Dated

*TONI HUDSON, TRANSCRIBER*